REGINALD C. VANDERBILT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JAMES R. DEERING, EXECUTOR, ESTATE OF REGINALD C. VANDERBILT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 2299, 16651. Promulgated January 11, 1927.

The decedent owned and operated a stock-breeding and produce farm. He kept numerous mares and stallions for breeding purposes, and produced some vegetables, poultry, and eggs for market. He realized no income from the sale of young animals bred on the farm, but, during the taxable years, received small amounts for service fees for stallions kept at stud and from the sale of produce. *Held,* that, in the circumstances disclosed by the evidence adduced in this appeal, the farm of the decedent was not a business conducted for profit.

*J. Harry Covington, Esq.,* and *Spencer Gordon, Esq.,* for the petitioner.

*Shelby S. Faulkner, Esq.,* for the respondent.

This is a proceeding for the redetermination of deficiencies in income taxes for the years 1919, 1920, and 1921, in the respective amounts of $8,741.73, $17,692.85, and $8,865.48, or a total of $35,300.06, of which nearly all is in controversy. The deficiencies arise from the action of the Commissioner in adding to the gross income of Reginald C. Vanderbilt for each of the years an amount representing the loss sustained in operating a stock-breeding and produce farm for such respective years. Subsequent to the filing of the first petition, now under consideration, Vanderbilt died, and the proceeding is prosecuted by the executor of his estate. By agreement of the parties the cases were consolidated for hearing and decision.

### FINDINGS OF FACT.

The decedent was a resident of New York and maintained an office at No. 3708, Grand Central Terminal, as an agent of the estate of Cornelius Vanderbilt.

Prior to the taxable years the decedent acquired a stock-breeding farm of about 235 acres, located at Portsmouth, in the State of Rhode Island. This property, designated as Sandy Point Farm, was equipped with some thirteen buildings, which included barns, cottages for the superintendent, employees, and servants, and a structure about 250 feet long, which enclosed and covered a training and show ring. The buildings, devoted to the purposes of the farm, represented an investment of approximately $75,000. In addition to the farm buildings there was a large family mansion which was not used for any purpose during the taxable years.

Sandy Point Farm was maintained primarily for breeding English Hackney horses. During the years involved in this controversy the decedent kept eighteen or twenty mares and three stallions of this breed. Two of his stallions were prize winners in their class at various horse shows throughout the country. All three of these horses were kept at stud on the farm, and breeding fees in the usual amounts for such animals were charged and collected for their services. Much of the farm was in cultivation for the production of forage and grain for feeding the animals kept thereon, and there was also a considerable area cultivated as a truck and vegetable garden. Including the superintendent and his wife, there was an average of fourteen employees who devoted all their time all the year round to actual farm work.

The decedent was at the farm very frequently, spending several months of each year there. During the taxable years while at the farm he did not live in the large house or mansion, but with his personal servant, and any friends who accompanied him, he lodged in a small cottage. At such times meals for himself and guests were cooked and served by the wife of the farm superintendent, and the entire cost thereof was credited to farm income.

Beginning prior to 1913, and continuing through the taxable years, the decedent advertised Sandy Point Farm and the Hackney stallions kept thereon in all the leading journals devoted to fine horse-breeding news, and also printed and had circulated many cards and folders describing the stallions kept at stud and setting forth the pedigrees of such animals and the charges for their services for breeding purposes. During the same period the decedent also exhibited some of his animals at fairs and horse shows throughout the country, and won many cash prizes and trophies offered for the best horses of the Hackney breed. He organized and was president of the Association of American Horse Shows until the date of his death, and was also president of the American Hackney Horse Society.

The gross income of Sandy Point Farm for 1919 was $2,285.53, of which $1,579.26 resulted from the sale of vegetables and eggs, and $706.27 from breeding fees; for 1921, $2,506.06, of which $1,934.74 resulted from the sale of vegetables, etc., and $571.32 from breeding fees. The operating deficits of the farm for the taxable years were $24,975.28 for 1919, $30,449.95 for 1920, and $26,989.33 for 1921. In his income-tax returns for such years, the decedent deducted such respective deficits from his gross income for each of the several years as losses sustained in trade or business. Upon audit the Commissioner disallowed the deductions so made, on the ground that the losses were not incurred in the trade or business of the decedent.

## OPINION.

LANSDON: In his original petition in Docket No. 2299, the petitioner, in setting forth the alleged errors of the Commissioner, stated that "said loss was sustained in a business carried on for profit." At the hearing, however, the efforts of counsel for his executor were directed to presentation of proof that the costs of operating Sandy Point Farm for each of the taxable years were ordinary and necessary business expenses. In his answer to the original petition the Commissioner states as a propositon of law upon which he relies that " the expenses incurred by the petitioner in operating his farm are not ordinary and necessary expenses paid or incurred in carrying on any trade or business and are, therefore, not properly deductible [from gross income] in computing net income under the provisions of sec. 214(a) (1) of the Revenue Act of 1918." In Docket No. 16651, the petitioner asserts and the Commissioner denies that the decedent operated the farm in question as his trade or business during the year 1921. It appears, therefore, that the petitioner may be asking for a deduction from gross income under one provision of the law, and that the Commissioner is disallowing it under a different provision of the same Act. Although the issues raised by the pleadings and argued at the hearing are somewhat confused, we shall consider that the controversy to be adjudicated arises from the Commissioner's disallowance of losses which it is contended the decedent sustained in conducting his trade or business during each of the taxable years.

The Revenue Act of 1918, under which relief is sought, provides:

Sec. 214. (a) That in computing net income there shall be allowed as deductions:

\*         \*         \*         \*         \*         \*         \*

(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in trade or business.

The parties agree as to the amount of the losses in question, that such losses were sustained during the respective taxable years, and that, if the decedent was engaged in a trade or business, they are proper deductions from his gross income in his income-tax returns for such years. It remains for us, therefore, to determine (1) whether in all circumstances the operation of a stud, stock, and truck farm is a trade or business within the meaning of the taxing statute, and (2) if it is a trade or business, whether the decedent was engaged therein during the years 1919, 1920, and 1921.

That farming is a business and, as such, is entitled to all deductions from gross income allowed in other branches of industry is well established both by the courts and the decisions of this Board.

*Plant* v. *Walsh*, 280 Fed. 722; *Wilson* v. *Eisner*, 282 Fed. 38; *Appeal of J. H. Sanford*, 2 B. T. A. 181; *Appeal of Kansas City Savings & Trust Co.*, 2 B. T. A. 1253; *Thomas F. Sheridan* v. *Commissioner*, 4 B. T. A. 1299.

The remaining question for our consideration is whether the decedent was engaged in the business of farming for profit during the taxable years. It is in evidence that he acquired Sandy Point Farm about the year 1906. The farm was equipped with all the necessary buildings suitable for the purposes for which it was operated. Such buildings, though substantial, represented no excessive capital investment. The mansion which was located on the farm was not used during the taxable years. The decedent was deeply interested in the breeding and exhibition of Hackney horses. He kept on the farm about twenty brood mares and three stallions of this breed. All these animals were used for breeding purposes, and, in addition, some of them were exhibited at fairs and horse shows, where they won many large cash prizes and other valuable trophies and ribbons. The arable land on the farm was all in cultivation for the production of forage crops and vegetables. The farming operations were under the direction of a superintendent, and not less than twelve persons were employed in farm labor for the entire year. Substantial amounts of money were spent during many years prior to and during the taxable years here involved, for the purpose of advising the public through advertising of the merits, pedigrees, and records of the stallions kept at stud by the decedent and the fees charged the public for the services of such animals for breeding purposes. The decedent did not use the farm as his residence, but was there often, and the cost of his meals was credited to farm income.

It appears that Sandy Point Farm was operated with all the outward appearance of a business conducted for profit or, at any rate, with hope of profit from operations. There is, however, a reverse side to the picture. A witness, who was the financial secretary of the decedent, testified that the accounts of the farm were kept by himself in the same books with the other personal accounts of the decedent, and that all items of income and expenditure pertaining to the operation of the farm were in separate columns and readily distinguishable from purely personal accounts. This may be true but, if so, there must have been many items of expense and income omitted from such accounts. It is established that the decedent exhibited his animals at horse shows throughout the country and won many cash prizes, but the record fails to disclose that the amounts of such prizes were included in the income of the farm or that the expense of attending shows and fairs was not included in farm operation cost. It was also proved at the hearing that about

twenty mares were kept for breeding purposes, but there is no record of any sales of young stock. Three horses, one a top liner at many American shows, were kept at stud, but the largest income from this source for any one year was only a little more than $700, although stud fees were $100, $50, and $35, for the respective stallions. Considering the number of breeding animals kept, the evidence discloses that there should have been at least fifteen young horses for sale annually, of which several should have been high class show horses and the remainder good, salable, commercial Hackneys. The receipts reasonably to be expected from this source should have been a substantial amount per year. The income from stud fees for three horses of the type owned by the decedent should also have been substantial in amount. Over and against the income that might reasonably have been expected, had the farm been operated for profit, are the facts that it is not in evidence that any horses, young or old, were ever sold, and that the maximum receipts from stud fees for any one of the taxable years was slightly in excess of $700. The number of animals kept was small for profitable operation of a property of the value and extent of Sandy Point Farm. The income received from sales of produce and fees was practically negligible.

Counsel for the executor argued that the fact that losses were sustained raises no presumption that the farm was not operated as a business, and seeks to support his position by citing the cases of *Plant* v. *Walsh* and *Wilson* v. *Eisner, supra*. Each of these cases is clearly distinguishable from the instant proceeding. In the *Plant* case the losses were sustained during the earlier years of the operation of a very extensive agricultural project. The court holds that in such circumstances losses may not be regarded as evidence that the enterprise was not conducted as a business. In the instant proceeding the enterprise was established at least twelve years before the first taxable year, and, on the admission of the executor's principal witness and also of counsel, sustained losses in each year in which it was operated. In such conditions the operating losses must have extinguished the original invested capital before 1918, and, had the farm been operated for business purposes by anyone relying on the receipts therefrom for livelihood or income, it would probably have been sold by the sheriff long before the beginning of the taxable years here in question. In the case of *Wilson* v. *Eisner, supra*, the taxpayer made a business of operating a breeding and racing farm. During many of the taxable years there involved, the farm was operated at a profit, and, for the whole period, it was carried on as a business and for the purpose of earning income for its owner.

Although it is asserted that farming was the only business in which decedent was actively engaged during the taxable years, the record discloses that he maintained an office in New York, where he acted

as· an agent for the estate of Cornelius Vanderbilt, and that he received for such services as he may have rendered an annual salary of $5,000. It is also in evidence that during the taxable years he bought and sold considerable volumes of securities, and that, when he sustained losses from such transactions, he deducted such losses from his gross income in his income-tax returns.

We are of the opinion that the decedent was not engaged in farming as a trade or business during the taxable years. The loss claimed from farm operations for each of the years in question was not a proper deduction from gross income.

*Judgment will be entered for the Commissioner.*

STERNHAGEN, dissenting: I can not agree that the operation of the farm was not a business. The facts indicate to me that the decedent conducted it as best he could to make a profit. That in fact it was not profitable is obviously not evidence against its being a business, *Thomas F. Sheridan*, 4 B. T. A. 1299, nor is the fact that he had other activities to occupy some of his time. It seems to me that this Board should be slow to judge that the conduct of an enterprise is so unbusinesslike as to deprive it of business deductions. Only in a clear case should it be done, and in my opinion this is not such a case.

MILLIKEN and MURDOCK concur in this dissent.