Continental Trading Inc. v. Commissioner.
Continental Trading, Inc. v. Commissioner
Docket No. 55212.
United States Tax Court
T.C. Memo 1957-164; 1957 Tax Ct. Memo LEXIS 81; 16 T.C.M. (CCH) 724; T.C.M. (RIA) 57164; August 30, 1957
M. W. Dobrzensky, Esq., Central Bank Building, Oakland, Calif., and S. H. Dobrzensky, Esq., for the petitioner. Aaron S. Resnik, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined the following deficiencies in income tax: Year
Deficiency
1948
$208,300.59
1949
151,559.71
1950
114,468.53 The principal issue is whether petitioner qualified as a resident foreign corporation during the years involved by engaging in trade or business within the United States. If petitioner prevails on that issue, a subordinate issue to be considered is whether respondent erred in disallowing deductions for interest, expenses, and loss on sale of property as not connected with income from sources within the United States. Findings of Fact Certain *82 facts are stipulated and are hereby found. Petitioner, a Panamanian corporation organized in May 1947, maintained its principal office in Mexico City, Mexico. It filed its Federal income tax return for 1948 with the collector of internal revenue for the first district of California, and its 1949 and 1950 returns with the collector of internal revenue for the district of Nevada. Those returns stated that petitioner was a resident foreign corporation with "Investment" as its principal activity. Petitioner qualified as a foreign corporation in Nevada in March 1948 and continued to be so qualified until March 1951. It used for its American address that of a Reno, Nevada company that acted as resident agent for petitioner and other foreign corporations. Petitioner represented that it maintained only one place of business in the United States. Grover Turnbow, a United States citizen with offices in Oakland, California, served as petitioner's president. After March 1948, at the suggestion of the California attorney who served as petitioner's vice president, Turnbow had petitioner's name added to the business names already appearing on his Oakland office door and on the building directory, *83 which were: International Dairy Association, Inc., International Dairy Engineering Co., and International Dairy Supply Company, hereafter referred to as Association, Engineering, and Supply, respectively. Turnbow was president and sole stockholder of Supply. Petitioner never used the Oakland address on its letterheads or otherwise and paid no rent for the Oakland office. Petitioner represented the incorporation of part of the vast holdings of Axel Wenner-Gren, an internationally famous financier whose wealth was over $1,000,000,000. Wenner-Gren held substantial amounts of stock in the Electrolux and Servel corporations, as well as sizable and diverse holdings in Mexican and other foreign enterprises. Prior to petitioner's incorporation, Turnbow served as attorney in fact in the United States for Wenner-Gren, who was then borrowing large sums from American lending institutions for use outside the United States. Turnbow became acquainted with Wenner-Gren in Mexico when he erected a recombined milk plant in which Wenner-Gren had a financial interest. Turnbow unsuccessfully sought to interest Wenner-Gren in financing the supplying of milk by Supply to the armed forces in the Far East. *84 Turnbow and his various enterprises were interested in erecting recombined milk plants in foreign countries. Prior to and during the years here involved, the program failed to materialize because of the inability to reconvert foreign currency into American dollars, and the instability of foreign currencies. Turnbow hoped that petitioner would assist in the financing of these plants if his program for the establishment of recombined milk plants in foreign countries proved feasible. Its function would be to secure funds, but without any voice or activity in the operations of the plants. Petitioner never undertook any activity in connection with the establishment of such recombined milk plants and never used its assets and borrowings for this or any related purpose. After petitioner's incorporation, it assumed Wenner-Gren's liabilities to various banks, having acquired his stock in the Electrolux and Servel corporations, which it thereupon pledged as security for loans. As of the beginning of 1948, petitioner had assumed indebtednesses of Wenner-Gren as follows: Bank of America, N.T. & S.A.
$1,100,000
Central Hanover Bank and Trust
Company, New York
480,000
Teleric, Inc.
926,000
*85 Petitioner liquidated the loan from Central Hanover Bank during 1948. The loan from Teleric, Inc. remained outstanding as of the end of 1950. It liquidated the loan from Bank of America in August 1948. From 1948 through 1950, petitioner had no paid employees in the United States. Turnbow received $1,500 per month during the last 6 months of 1950 denominated as salary for his services to petitioner. This represented part of an over-all settlement effectuated in June 1950 between Turnbow and Wenner-Gren, as individuals, whereby Turnbow would receive from Wenner-Gren stock and cash totaling $105,000. The settlement covered, among other items, Turnbow's services to Wenner-Gren from October 1946 through June 1950. Petitioner maintained no books of account in the United States. Its only records consisted of bank statements, check books, and documents pertaining to transactions within the United States, all in the care of Turnbow's secretary at Oakland. Petitioner maintained bank accounts in the United States at the First National Bank, Reno, Nevada, and at the Bank of America, N.T. & S.A. in San Francisco. Petitioner's only assets in the United States at the end of 1948 consisted of *86 Electrolux and Servel stock and the two bank account balances. Petitioner reported on its tax returns for the years in question that it derived more than 50 per cent of its gross income from sources outside the United States. It reported gross income from sources within the United States, as follows: 1948
$817,791.39
1949
605,635.10
1950
446,863.19 Of the 1948 gross income, $823,635.50 represented dividends on Electrolux and Servel stock. The difference was represented by a reported net loss of $5,844.11 resulting from sales of property other than capital assets. Of the 1949 gross income, $602,125.20 represented dividends, and $3,509.90 "Other Income in the United States." Of the 1950 gross income, $441,624 represented dividends from the Electrolux Corporation, and $5,239.19 additional income "From Sales." During 1948, petitioner's activities in the United States included the following: (a) It collected dividends on Electrolux and Servel stock. (b) It made payments of principal and interest on outstanding loans. (c) In May it borrowed $1,000,000 from the Bank of America, which Wenner-Gren used in acquisition of Mexican telephone companies. (d) On *87 August 6, it borrowed $1,850,000 from the Bank of America, of which it used $1,100,000 to repay prior indebtedness of Wenner-Gren to the bank, which petitioner had assumed. On that same date petitioner drew checks in excess of the balance of $750,000 to make payments of principal and interest on other outstanding indebtedness. During 1949, petitioner's activities in the United States included the following: (a) It collected dividends on Electrolux and Servel stock. (b) It made payments on principal and interest on outstanding loans. (c) It secured and repaid short-term advances from Turnbow. (d) In September it borrowed $1,700,000 from the Bank of America, used to liquidate the outstanding balances of two loans from that bank. (e) In December it sold its 55,000 shares of Servel stock, theretofore pledged with the Bank of America to secure loans. It used the proceeds of the sale to pay outstanding obligations to the bank. During 1950, petitioner's activities in the United States included the following: (a) It collected dividends on Electrolux stock. (b) It made payments on principal and interest on outstanding loans. (c) On January 3, it borrowed $2,000,000 from the Central Hanover *88 Bank. It used the bulk of this loan to repay the $1,700,000 loan from the Bank of America. It transferred approximately $400,000 to its account in Mexico City, $110,000 for the account of a Swedish bank, and approximately $275,000 to its account at the Bank of America, much of which was thereafter transferred to petitioner's Mexican accounts. (d) Petitioner repaid the $2,000,000 loan. In its negotiations with the Central Hanover Bank, petitioner represented itself as a Panamanian corporation, doing business in foreign countries. The funds borrowed by petitioner were in the main used by Wenner-Gren. Turnbow had no direct knowledge of their use. In July 1948, petitioner engaged in a transaction of a type in which it was not previously nor subsequently engaged. It purchased a carload of dry milk fat from Kraft Foods Company for $46,212.75. Through Association, a company in which Turnbow was interested, it resold the fat 1 month later to Kraft for $40,248. Association requested that Kraft make the check payable to petitioner. Petitioner reported the loss in its 1948 tax return. As an accommodation to a Mexican corporation petitioner purchased, in 1950, equipment for that corporation *89 for which it was reimbursed without profit. In each year, the only other activity reported by petitioner was represented by nominal amounts of income resulting from transactions relating to cans used by Supply. In 1948, such reported income amounted to $120.64; in 1949, $3,509.90; in 1950, $5,239.19. In connection with its contract for supplying recombined milk products to troops in the Far East, Supply found it necessary, commencing in 1948, to obtain tin cans. The contract set forth specifications for the necessary cans to be bought in the United States. In 1948, Supply procured the cans from Western Can Company, hereafter referred to as Western. An employee in Supply's procurement department ordered by telephone the necessary number of cans and followed up with a written purchase order. Supply received shipments for which it paid by check. In December 1948, petitioner undertook to place with Western, in its own name, an order covering precisely the same type of cans and bearing the same markings as Supply had theretofore ordered in its own name from Western. Western billed petitioner at the same price which Supply had paid Western on an earlier order. That order, in petitioner's *90 name, was first telephoned to Western by either Supply's procurement department or Turnbow's secretary on December 8, 1948. The Western salesman who received the order filled out an order form in the name of Supply, but petitioner's name was added later. On the day that the order was telephoned to Western, Supply prepared an export purchase order for the cans addressed to petitioner. Supply had used the same form in preparing its orders theretofore forwarded directly to Western. Petitioner then forwarded to Western a written confirmatory order in its name. Petitioner's check dated December 16, 1948 extinguished the obligation to Western for the cans. Supply paid an invoice on petitioner's letterhead for the cans at a 5 per cent increase in price within 10 days of the invoice date. In 1949, petitioner utilized the same recording and routing of orders for cans needed by Supply on 37 occasions. Petitioner derived the proceeds reported as income on its 1949 returns because it billed Supply at 5 per cent more than it was billed by Western. In 1950, petitioner utilized the same recording and routing on approximately 48 occasions and derived the reported profit from sales transactions *91 from this operation. There was no business purpose connected with the can transactions engaged in by petitioner. It never used its Nevada office in these operations. It carried no inventory of cans and ordered no cans other than those used by Supply. In every instance in which Supply acquired cans in this way, it paid petitioner within 10 days of petitioner's payment to Western. After 1950, Supply recommended ordering and purchasing of cans directly from Western. During 1948, 1949 and 1950, petitioner was not engaged in trade or business within the United States. Opinion Business has been defined as "[that] which occupies the item, attention, and labor of men for the purpose of a livelihood or profit." Flint v. Stone Tracy Co., 220 U.S. 107, 171. "The word, notwithstanding disguise in spelling and pronunciation, means busyness; it implies that one is kept more or less busy, that the activity is an occupation." Shell [Snell] v. Commissioner, ( C.A. 5) 97 Fed. (2d) 891, 892, affirming B.T.A. Memorandum Opinion. "* * * it is essential that livelihood or profit be at least one of the purposes for which the employment is pursued, in order to bring *92 it within the accepted definition of the word * * *." Deering v. Blair, ( C.A., D.C.) 23 Fed. (2d) 975, 976, affirming 5 B.T.A. 1055. Transactions which are not entered into for profit and which do not and in all probability cannot result in a profit, particularly where such transactions are of an isolated and noncontinuous nature, will not dictate the conclusion that one is engaged in business. And that, notwithstanding petitioner's categorical statement to the contrary in its brief, we view as the only issue. Petitioner claims the tax status of a resident foreign corporation in order to receive certain tax benefits. For this it must have been "engaged in business" in the United States. [1] The desired deductions and credits Congress could extend or withhold. New Colonial Co. v. Helvering, 292 U.S. 435. Our problem is to determine congressional intent with respect to the relevant statutory provision as applied to the demonstrated facts. *93 As to the legislative frame of mind there seems little room for doubt. The enactment of the 1942 amendment was accompanied by an unequivocal statement that a foreign corporation merely servicing its investments in this country was not the type of taxpayer to which the section was intended to refer. [2]
The detailed analysis submitted by petitioner of all of its transactions during the years in controversy shows that only items accounting for a fraction of 1 per cent of petitioner's total income represent those which by any stretch of the imagination could be considered business. See *94 Linen Thread Co., Ltd., 14 T.C. 725. Such transactions resulted in no substantial gain, and considering the time spent on them they could not, and in several instances actually did not, result in even a nominal net profit.[3] In this case we think their character was such that they cannot be regarded as business transactions within the quoted definition because of their obvious lack of business purpose. Thacher v. Lowe, ( S.D., N.Y.) 288 Fed. 994; Deering v. Blair, supra.
Petitioner relies on several cases for the proposition that the question is not what was petitioner's business, but whether what it did was in fact what it appeared to be in form. E.g., W. P. Hobby, 2 T.C. 980; Clara M. Tully Trust, 1 T.C. 611; John Junker Spencer, 19 T.C. 727. But these are authorities in an area which we regard as foreign to the present issue. There the question of purpose was significant in order to determine whether or not to give effect *95 to the transactions in question, not in order to determine whether petitioner was, in fact, Jan Casimir Lewenhaupt, 20 T.C. 151 [19,606], affirmed per curiam (C.A. 9) 221 Fed. (2d) 227, "engaged in business." See Marian Bourne Elbert, 45 B.T.A. 685. There are at least two factual reasons for answering that question here in the negative. The first is the element of purpose, in view of the difficulty of assuming that one would be engaged in business who had no "business purpose" but whose conduct, as apparently admitted by petitioner, was dictated not by a business objective but purely by a desire to save taxes. Gregory v. Helvering, 293 U.S. 465; Linen Thread Co., Ltd., supra.In this view we may regard the transactions as "substantive" in the sense that the operations described were actually performed, just as they were so regarded in the Gregory case, without concluding that they constituted the conduct of a business, that they rendered the petitioner "busy," or that they were engaged in for a livelihood or profit. Second, for a taxpayer to be engaged in business, there must be a fair degree of activity, scope *96 and continuity in the transactions undertaken. See Ehrman v. Commissioner, ( C.A. 9) 120 Fed. (2d) 607, affirming 41 B.T.A. 652, certiorari denied 314 U.S. 668; Snell v. Commissioner, supra. The record as a whole and petitioner's summary of the transactions to which we have already referred demonstrate conclusively that there was neither consistency nor frequency in those few isolated activities which could, within the express legislative intent, otherwise have been the kind of business in which Congress expected a foreign corporation to engage for purposes of the present issue. And it is not without significance that petitioner itself on its tax return described its activity as "Investment." Upon all the evidence, we conclude not only that petitioner has failed to carry its burden of showing that it was engaged in business in the United States, but that, in fact, the record affirmatively shows the opposite to be true. Decision will be entered for the respondent. Footnotes
1. Internal Revenue Code of 1939. "SEC. 231. TAX ON FOREIGN CORPORATIONS. "(b) Resident Corporations. - A foreign corporation engaged in trade or business within the United States shall be taxable as provided in section 13 and section 15↩."
2. "A tendency has arisen, principally on the part of foreign corporations which are substantial holders of the stock of domestic corporations * * * to attempt to establish that they have an 'office or place of business' within the United States and hence secure the very different tax treatment accorded taxpayers * * * Since such corporations * * * engage in no other economic activities in the United States, they cannot be said to be engaged in trade or business within the United States." H. Rept. No. 2333, 77th Cong., 1st Sess., 1942-2 C.B. 372↩, 449.
3. Petitioner's so-called "right" to conduct itself as it chooses is not now in controversy. The question is what are the effects of such conduct upon petitioner's tax liability.↩