Bertha R. Conyngham v. Commissioner.
Conyngham v. Commissioner
Docket No. 94447.
United States Tax Court
T.C. Memo 1964-194; 1964 Tax Ct. Memo LEXIS 143; 23 T.C.M. (CCH) 1179; T.C.M. (RIA) 64194; July 16, 1964
*143 Held, that the operation of a farm during the taxable years 1956, 1957, and 1958 did not constitute the carrying on of a trade or business and that the petitioner is not entitled to deduct ordinary and necessary expenses incurred in connection therewith, losses sustained in the operation thereof, or depreciation on account of property used on the farm. Alphonsus R. Romeika and Ione T. Romeika, 215 S. Broad St., Philadelphia, Pa., for the petitioner. Francis *144 J. Cantrel, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years 1956, 1957, and 1958 in the respective amounts of $7,880.79, $7,842.99, and $7,425.71. The petitioner having conceded that assessment and collection of any deficiency for the taxable year 1956 is not barred by the statute of limitations, the only issue remaining for decision is whether the petitioner during the taxable years 1956, 1957, and 1958 operated a farm as a trade or business, entitling her to deduct expenses and losses incurred in the operation of the farm and depreciation on property used in connection therewith. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioner, an individual, is a resident of Lehman Township, Luzerne County, Pennsylvania. She filed her income tax returns for the taxable years 1956, 1957, and 1958 with the district director of internal revenue at Scranton, Pennsylvania. In 1910 John N. Conyngham, petitioner's deceased husband, purchased a tract of land in Lehman Township, Luzerne County, Pennsylvania, *145 at a cost of $6,599.08. Later other land was added by him at a cost of $2,090.70. Thereafter, another tract was purchased at a cost of $9,000 by petitioner, who permitted her husband to use the land free of charge. This land, consisting of at least 463 acres, is known as the Hayfield Farm. John N. Conyngham operated this property as a farm until he died in 1935. [1]
In John N. Conyngham, (2 P.-H. Board of Tax Appeals Memorandum Decisions, para. 33634) it was held that during the taxable years 1927 and 1928 the Hayfield Farm (together with a farm known as Naemoor Farm) was operated as a business and that accordingly John N. Conyngham was entitled to deduct losses sustained during those years in the operations of the farms in the respective amounts of $47,749.40 and $54,112.31. In such Opinion it was found that the taxpayer had sustained substantial losses in the operation *146 of Hayfield Farm during each year over the period 1913 through 1928. Sometime prior to his death, John N. Conyngham built an 85-room residence, known as Hayfield House, on a tract of land which he had acquired in 1927 and which was a part of the then Hayfield Farm. John N. Conyngham died testate on July 12, 1935, leaving surviving him his wife, the petitioner herein. His will was duly probated and the petitioner filed an election to take under the will. By his will, John N. Conyngham bequeathed to his wife the sum of $500,000 in cash or securities and devised to her all his real estate, except certain farms. He gave and devised to her for her life the Hayfield Farm and certain other farms, together with the livestock, tools, and personal property connected therewith, with full power to remove or replace any buildings thereon, to make such improvements as she might see fit, to conduct and manage the farms in any manner which she might desire without obligation to render any account or to give security for the protection of any remainderman, and with full power to sell any or all of such real or personal property and to appropriate the proceeds to her own use. It was provided that *147 upon the wife's death any of such farms remaining unsold should go to the testator's nephew, Richard Ivers Robinson, absolutely. By his will the testator also bequeathed to trustees the sum of $500,000 in cash or securities with direction to invest the same and to pay over the net income therefrom in installments to the petitioner during her life, or so long as she retained possession and ownership of Hayfield Farm, to be used by her for the "upkeep, maintenance, and improvements" of Hayfield Farm. Therein the testator also provided that upon the death of his wife (if she still retained possession of the farm), the trust income should be paid to his nephew, Richard Ivers Robinson, if he should have survived her, for the upkeep, maintenance, and improvement of the farm, until he should reach the age of 45 years (provided he should have retained possession and ownership of the farm until that time), and that at such time the principal of the trust fund should be conveyed to Richard Ivers Robinson absolutely. This provision was to take effect immediately in the event the wife, during her life, should release and convey her interest in the farm to the nephew, Richard Ivors Robinson. *148 It was further provided that if, for any reason, the trust fund should not become payable to the nephew, Richard Ivors Robinson, such trust fund should, when the proper time for final distribution should arise, be paid over to Conyngham Robinson, son of the nephew, Richard Ivors Robinson, if living, but that if Conyngham Robinson should not be living, then the trust fund should become a part of the testator's residuary estate. The testator further provided that the net income of his residuary estate should be paid to his wife for her life, with the remainder over to others. At all times after the date of the death of her husband in 1935 until the time of the hearing in this case, the petitioner continued in possession and ownership of Hayfield Farm. She has continued to occupy Hayfield House for 6 months of each year commencing in late April. After her husband died the petitioner continued to employ a superintendent to operate the farm. She was interested in the farming activity to the extent of observing the farm and inspecting the livestock. Gilbert W. Howell is an employee of the Conyngham estate and is a trustee of both the Hayfield Farm Trust and of the John N. Conyngham *149 residuary trust. In 1946, when he was a bookkeeper, he was employed in connection with the business affairs of the petitioner. His duties with respect to the Hayfield Farm commenced about 1949. He would discuss the operation of the farm with the petitioner and present each week bills to her in connection therewith. In 1950 the petitioner became ill and she gave Howell additional authority with respect to the farm, including the authority to hire and fire farm personnel. The petitioner's physical condition deteriorated each year and Howell assumed more responsibility with respect to the farm. By 1953 the petitioner's physical condition precluded her making any decisions and Howell assumed full responsibility in connection with the farm. During the years in question, 1956, 1957, and 1958, and prior thereto, the petitioner was over 90 years of age, was suffering from illnesses which resulted in her being confined to bed practically all of the time and being attended by nurses around the clock. She was unable to conduct any gainful work or participate in any business affairs. This condition persisted continuously up to the time of the trial in this case. From the time the petitioner became *150 unable to conduct her affairs Howell has reported to Robinson, who is the petitioner's nearest relative and also a trustee of the Hayfield Farm Trust, with respect to the operation of the farm. Over the period from 1956 to 1963 about 200 acres of Hayfield Farm were pasture land, about 40 acres were timberland, about 100 acres were swamp or brushland, about 55 acres were devoted to the growing of corn, about 27 acres were devoted to the growing of oats, and the remainder of the farm was devoted to the growing of hay. During that period the average amount of hay raised was 11,000 bales per year. The hay, oats, and corn were not sold, except in rare instances, but were used to feed the stock on the farm. In addition, feed was purchased for the stock. The farm contains some old apple orchards from which apples were sold for the purpose of making cider. During some undisclosed year an attempt was made to grow potatoes, but the effort proved unsuccessful and was abandoned. During his lifetime John N. Conyngham bred Clydesdale horses for show and sale, but those on hand at the time of his death were thereafter sold, principally in 1936 and 1937. The farm has always raised pigs. During *151 John N. Conyngham's life there were on the farm about 25 to 30 pigs. When Howell assumed responsibility for running the farm in 1949, he changed the breed of pigs raised to a breed which he thought would be more saleable. During the years in question about 75 to 80 small pigs were sold at an average selling price of about $10. Until about 1961 sheep were also raised on the farm for sale, but because of the decrease in the market price for lambs and wool this operation was discontinued. The farm has always had a few milch cows. The milk was not sold to the public. It was sold to the farm employees at a small fraction of its market value because of the relatively low wages paid the employees. Although in earlier years donkeys had been raised on the farm for sale, none was raised or sold in the years in question. In such years there were on the farm 3 or 4 donkeys but they served no useful purpose. There were also raised on the farm about 25 or 30 ducks per year. None of these was ever sold except to the petitioner. The petitioner also on occasion bought from the farm lambs and pigs. Any goods, products, or other property obtained by petitioner from Hayfield Farm were paid for by her *152 from her personal account at market price. No disbursements were ever made by Hayfield Farm for any personal expenses attributable to the petitioner. During the years in question and prior thereto, beef cattle were raised on the farm. The practice was to purchase 700-800 lb. steers for fattening and resale at weights of 1,000-1,200 lbs. During the years 1956 through 1962, the average number of steers on hand was about 70 to 80. Howell determined that this practice was not profitable. Accordingly, in 1959, after receiving advice from county agents and others interested in cattle, he abandoned the practice of fattening cattle and inaugurated a policy of purchasing smaller steers and selling them at weights of about 700-800 lbs. At the time of the trial there were on the farm about 130 to 136 steers. About one acre of land of pasture is required for the raising of one steer. The number of acres of pasture land did not increase over the years from 1956 to 1963. No attempt was made to drain any of the swamp land in order to convert it into pasture. During the years in question and up to the time of the trial of this case, no cattle were bred on the farm, but, as stated, were purchased. *153 To develop a breeding herd requires a number of years and Howell did not formulate any longrange plans for developing a breeding herd or developing the farm because of the short life expectancy of the petitioner. Since the time of the death of John N. Conyngham the farm has contained the same buildings, except for 2 small sheds which were torn down. There are on the Hayfield Farm 12 buildings, consisting of barns, sheds, and storage facilities. In addition, there are 12 dwellings, some of which are occupied by the farm employees, the average number occupied during the years in question being approximately 4 to 6. The others were unoccupied. The amount of rent paid by each employee is about $10 to $20 per month, which is substantially below the rental value of the dwellings. During the years in question, and prior thereto, the number of employees on the farm varied between 12 and 16, and the amount of annual wages paid was in excess of $21,000. Over this same period the petitioner employed an average of 7 persons to run the Hayfield House and an average of 4 to 7 persons to maintain the grounds surrounding the house. These employees were paid out of an account which was separate and *154 distinct from the farm account. The bookkeeper kept separate books and records for the house and for the farm. In the years in question several new pieces of equipment were purchased to facilitate the planting and harvesting of those crops used as feed for the livestock. Some of this new equipment was to replace worn out equipment. During each year of its history the operation of Hayfield Farm has resulted in a net loss. For the taxable years 1935, 1936, and 1937 the petitioner in her returns deducted the losses sustained in the operation of Hayfield Farm. The respondent, upon audit, reduced the amounts of the claimed deductions to amounts equal to the amounts of income received from the Hayfield Farm trust. The petitioner agreed to these adjustments for those years. From 1938 to 1949, inclusive, the petitioner in her income tax returns deducted losses sustained in the operation of Hayfield Farm equal to the amounts of income received from the trust. The respondent, upon audit, reduced the amounts claimed as deductions for the taxable years 1948 and 1949 to amounts equal to 25% of the amounts of income received from the trust. The petitioner agreed to these adjustments for those *155 years. Thereafter, in her return for each taxable year the petitioner deducted losses sustained in the operation of the Hayfield Farm in amounts equal to 25% of the amounts received from the trust. The following tabulation shows the total income, total expenses, and net losses sustained in the farming operation from 1953 through 1961: Total
Total
Net
Year
Income
Expenses
Loss
1953
$3,425.09
$46,143.81
$42,718.72
1954
2,274.87
47,709.26
45,434.39
1955
8,456.69
46,115.50
37,658.81
1956
7,112.47
44,346.85
37,234.38
1957
2,230.57
44,235.25
42,004.68
1958
9,721.18
46,233.95
36,512.27
1959
6,415.96
46,263.05
39,847.09
1960
9,016.59
39,882.51
30,865.92
1961
3,888.31
39,324.73
35,427.42
The following tabulation shows the number of steers sold in each of the years 1953 to 1961, inclusive, and the profit or loss thereon: Number
Profit or
Year
Sold
(Loss)
1953
56
($4,085.40)
1954
111.51
1955
34
533.64
1956
30
( 639.44)
1957
50
( 692.13)
1958
55
2,154.21
1959
85
1,205.78
1960
85
2,555.03
1961
89
2,022.12
The inventory values of livestock and crops as of the end of each of *156 the taxable years 1953 to 1961, inclusive, as shown on the petitioner's income tax returns, were as follows: Year
Amount
1953
$18,652.90
1954
13,523.28
1955
14,751.50
1956
13,543.69
1957
9,206.35
1958
9,923.00
1959
8,287.10
1960
9,293.50
1961
5,488.22
Through the years the income from the Hayfield Farm Trust which had been set up by the petitioner's deceased husband was paid in quarterly installments by checks drawn in the name of the petitioner. These checks were deposited in a separate account for Hayfield Farm, to which were also deposited any income received from the farm. The account was handled by Howell who made disbursements therefrom in carrying on the activities at the farm. All of such income was expended in connection with the farm. In her income tax returns for the taxable years 1953 to 1961, inclusive, the petitioner reported substantial amounts of income from dividends, interest, various trusts, including the Hayfield Farm Trust, and from the sale of assets. In her income tax returns for those years the amount of net income from the Hayfield Farm Trust and the amount of total adjusted gross income reported were as follows: Net Income From
Hayfield Farm
Adjusted Gross
Year
Trust
Income
1953
$28,294.39
$187,190.52
1954
30,698.17
214,346.09
1955
35,602.76
253,413.07
1956
34,640.84
738,445.42
1957
34,534.93
231,027.23
1958
34,300.36
231,998.79
1959
34,662.96
230,575.42
1960
30,795.19
230,819.68
1961
33,512.80
246,205.16
*157 The details of the farm income and expenses, including depreciation, for the years in question, 1956, 1957, and 1958, which are set forth in the petitioner's income tax returns, are as follows: 1956
1957
1958
INCOME
Sale of Livestock and crops
$ 4,718.72
$ 5,010.61
$ 4,610.32
Less: Cost of Sales
1,317.81
4,714.34
(716.65)
Gross Profit or (Loss)
$ 3,400.91
$ 296.27
$ 5,326.97
Rents
$ 2,007.00
$ 2,201.00
$ 2,109.00
Profit or (Loss) on Sale of Purchased Livestock
(639.44)
(692.13)
2,154.21
Other Income
159.00
316.43
111.00
Wood and Lumber
1,000.00
4.00
5.00
Sale of Old Wagons, etc.
1,185.00
105.00
15.00
TOTAL INCOME
$ 7,112.47
$ 2,230.57
$ 9,721.18
EXPENSES
Labor for Farm
$21,191.61
$21,694.86
$23,645.29
Feed, Hay, Straw, etc.
6,859.65
4,783.53
4,591.04
Seed Plants
93.80
374.76
358.70
Machine Hire
170.00
524.00
174.00
Fertilizer and Spray Material
353.50
635.68
849.26
Fuel and Oil for Farm Work
2,057.24
1,544.51
2,101.96
Taxes
744.42
742.24
781.19
Insurance
2,875.36
3,479.66
2,494.62
Veterinary
249.34
136.48
149.70
Drugs & Medicine
876.38
Electric Light & Power, Telephone
820.52
857.46
569.53
Truck Expense
454.46
743.41
Expenses for Fairs and Expositions
3,594.81
Repairs and Replacements
1,822.08
996.39
Special Compensation Pension
840.00
1,320.00
Miscellaneous Supplies and Expenses
1,187.85
1,138.13
675.72
Depreciation on Buildings
4,627.02
5,264.14
5,371.75
$44,346.85
$44,235.25
$46,233.95
NET LOSS
$37,234.38
$42,004.68
$36,512.27
*158 In her income tax returns for the taxable years 1956, 1957, and 1958 the petitioner did not claim as deductions the full amount of farm net losses shown above. Rather, for each of such years she claimed as a loss from farming an amount equal to 25% of the Hayfield Trust income paid to her. The amounts so deducted for the taxable years 1956, 1957, and 1958 were $8,660.21, $8,633.73, and $8,578.69, respectively. In the notice of deficiency the respondent disallowed the claimed deductions on account of farm losses with the statement "It is held that you did not operate your farm as a business for profit." The Hayfield Farm during the taxable years 1956, 1957, and 1958 was not operated for the purpose or with the intention of making a profit, and such operation did not constitute the carrying on of a trade or business. Opinion The sole issue presented is whether, as contended by the petitioner, the Hayfield Farm was operated by her during the taxable years in question, 1956, 1957, and 1958, as a trade or business. If so she is entitled to deduct ordinary and necessary expenses incurred in connection therewith (section 162 of the Internal Revenue Code of *159 1954), losses sustained in the operation thereof (section 165 of the Code), and depreciation on account of property used on the farm (section 167 of the Code). The respondent determined, and contends, that the farm was not operated as a trade or business and that therefore the petitioner is not entitled to any deductions on account of the farm operation. [2] The respondent's determination is presumptively correct and the burden of proof is upon the petitioner to show error in such determination. Whether the operation of the *160 farm constituted a trade or business depends upon whether it was operated for the purpose of a livelihood or profit. See Flint v. Stone Tracy Co., 220 U.S. 107; George D. Widener, 8 B.T.A. 651, affd. (C.A. 3) 33 F. 2d 833; Deering v. Blair, (C.A.D.C.) 23 F. 2d 975, affirming 5 B.T.A. 1055; Thacher v. Lowe, (D.C.S.D.N.Y.) 288 F. 994; Edwin S. George, 22 B.T.A. 189; and Henry P. White, 23 T.C. 90, affd. in White v. Commissioner, (C.A. 6) 227 F. 2d 779, certiorari denied 351 U.S. 939. We are, therefore, concerned with the intent of the petitioner in operating the farm. See Morton v. Commissioner, (C.A. 2) 174 F. 2d 302, affirming a Memorandum Opinion of this Court.. The question is one of fact, requiring an examination of the facts and circumstances of each case. Higgins v. Commissioner, 312 U.S. 212. Upon the death of her husband in 1935, the petitioner received, pursuant to the will of the deceased, a life interest in Hayfield Farm with power to sell it at any time and appropriate the proceeds to herself. She has continued to *161 operate the farm ever since. The decedent by his will set up a trust to provide income for the upkeep, maintenance, and improvement of the farm. During the period since 1935 the net income from such trust has been paid over to the petitioner and has been used in connection with the farm. The amount so received in each of the taxable years 1956, 1957, and 1958 was about $34,000. In each year of the operation of the farm a net loss has been sustained. The net loss in any year over the period 1953 through 1958 was never less than $36,500, and in one year the net loss was in excess of $45,000. For the taxable years 1956, 1957, and 1958 the net losses were, respectively, about $37,000, about $42,000, and about $36,500. It has been recognized in many cases that although a history of losses in an enterprise may not in and of itself be sufficient to show a lack of profit-motive, it is an important factor bearing on the taxpayer's true intention. Morton v. Commissioner, supra; Edwin S. George, supra; and Henry P. White, supra. At the time of the trial, and for many years prior thereto, the petitioner, due to age and infirmity, has been unable to conduct *162 any of her affairs, and she was unable to testify at the trial. Since about 1953 Gilbert W. Howell has been in charge of the operation of the farm. He testified that prior to the time the petitioner became incapacitated he was accustomed to presenting the farm bills to her and discussing the farm operations with her. He testified that in a discussion he had with her in 1949 she insisted that the bills were too high, that a profit could not be made with such large bills, and that it was his responsibility to reduce the bills. He testified that since taking over the operation of the Hayfield Farm it has been his intention to operate the farm at a profit, and that he has made many changes in the operations to try to make a profit. However, from the evidence it is clear that no crops were raised for sale to the public from which a profit would be derived. Nor was sufficient livestock raised to justify the expectation of profit. The principal activity was the raising of beef cattle, and the crops raised were used to feed such cattle. Howell testified that he believes that he can in the future operate the farm at a profit by draining the swampy area, growing more corn, and obtaining more *163 steers. He stated that if the swamp land were converted he would be able to raise 130 steers in addition to the approximately 130 beef cattle on the farm at the time of the trial. There was testimony, and we have found as a fact, that an acre of pasturage in necessary for raising one steer. The evidence also shows that there are no more than 200 acres of pasture land on the farm. It would seem, therefore, that the maximum number of steers which could be raised on the farm would be about 200, but even if 260 steers per year were raised, it seems clear from the farm's past experience that it would not be reasonable to conclude that the farm could be operated at a profit. In 1958, the year in which the most profit was made per steer sold, the average profit per steer was about $40. At this rate of profit per steer, 260 steers would yield a profit of about $10,000, which clearly would not be sufficient, upon the basis of past history, to convert the operation into a profitable one. Upon consideration of the whole record, we think that during the time the petitioner operated the farm, including the years in question, it could not reasonably be expected that the operation of the farm would *164 result in a profit. We cannot conclude that the petitioner, in the light of the prior unsuccessful operation of the farm by her deceased husband, could have entertained a bona fide expectation or intention of making a profit on the operation of the farm. The most that can be said we think is that Howell, [3] and the petitioner before she became incapacitated, merely hoped that the farm might produce a profit. But, as we stated in Louise Cheney, 22 B.T.A. 672, it would be specious to say that a vain hope that on some remote day a profit may result is enough to give the operation of a farm the character of a trade or business. It is our conclusion that the evidence establishes, and we have found as a fact, that the Hayfield Farm during the years in question was not operated for the purpose or with the intention of making a profit. *165 We hold therefore that the farm was not operated as a trade or business and that the petitioner is not entitled to deduct any expenses or losses incurred in connection with the operation of the farm or any depreciation on the property used in connection therewith. It should be added that the fact that in 1933 we held that the petitioner's deceased husband operated the farm during the taxable years 1927 and 1928 as a business for profit is not decisive here. His intention or purpose in the operation of the farm in those years cannot be ascribed to the petitioner in operating the farm in later years, including the years in question. On brief counsel for the petitioner points out that during the years in question, and indeed from 1953 on, the petitioner was mentally and physically unable to have any motive or intent to carry on a business, a hobby, or any other activity. He also states that the record is devoid of any evidence to show that prior to the time the petitioner became incapacitated she operated the farm as a hobby or for some reason other than a business purpose. But, as stated, the burden of proof is upon the petitioner here. It was incumbent upon her to establish that *166 the farm was operated as a business for profit. This has not been done. As stated, we think the record establishes that the farm was not operated for profit, and we have so found as a fact. On brief counsel for the petitioner also makes much of the fact that for prior years the respondent, after audit, allowed the petitioner to deduct some portion of the claimed farm losses. However, the action of the respondent with respect to prior years does not preclude or estop him from taking a different position for a subsequent year. Automobile Club of Michigan v. Commissioner, 353 U.S. 180; and Wiles v. United States, (C.A. 10) 312 F. 2d 574. Decision will be entered for the respondent. Footnotes
1. In 1935 Hayfield Farm, exclusive of Hayfield House, was appraised by an appraiser for the Conyngham estate for purposes of the estate tax at a valuation of approximately $94,000. The value of the farm at the time of the trial was about $250,000, due principally to the increase in the value of land in that area.↩
2. The respondent has not determined, and does not contend, that the petitioner is taxable upon any of the receipts from the operation of the farm. In this connection see section 1.162-12 of the Income Tax Regulations, which provides in part as follows: If a farm is operated for recreation or pleasure and not on a commercial basis, and if the expenses incurred in connection with the farm are in excess of the receipts therefrom, the entire receipts from the sale of farm products may be ignored in rendering a return of income, and the expenses incurred, being regarded as personal expenses, will not constitute allowable deductions.↩
3. Howell testified, in effect, that when he took over the operation of the farm he knew he could not do very much, but that he did make a number of changes which he thought were advisable, that he did not adopt a long-range plan for the operation of the farm because this would have been costly, and he did not believe it was advisable for the reason that he did not think it would be completed due to the short life expectancy of the petitioner.↩