Mead's Bakery, Inc. v. Commissioner.
Mead's Bakery, Inc. v. Commissioner
Docket No. 94027.
United States Tax Court
T.C. Memo 1964-104; 1964 Tax Ct. Memo LEXIS 231; 23 T.C.M. (CCH) 607; T.C.M. (RIA) 64104; April 22, 1964
*231 Petitioner was a family-owned corporation engaged in the business of baking and distributing bread and related products in the southwestern part of the United States. Petitioner's activities in this business, including its activities during the years in issue, reflect sustained growth, expansion and diversification. During the years in issue petitioner retained all of its earnings and paid no dividends. During this period petitioner also made substantial advances to an affiliated corporation which was not engaged in any trade or business. Held: The amounts advanced to petitioner's affiliate represent unreasonable accumulations of earings. The earnings retained by petitioner in excess of the amounts advanced to its affiliate were retained to meet the reasonable needs of its business, and petitioner is entitled to an accumulated earnings credit based thereon. Petitioner, during the years in issue, was availed of for the purpose of avoiding the income tax with respect to its shareholders. Donald L. Wilson and Kenneth G. Tarlton, for the petitioner. Harold D. Rogers, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The respondent determined deficiencies in *232 petitioner's income tax, as follows: Fiscal Year Ended
Deficiency
April 30, 1956
$ 41,735.30
April 30, 1957
104,768.46
April 30, 1958
57,226.14 Respondent made a number of adjustments in petitioner's taxable income for each of the years in question, which adjustments petitioner has conceded. The principal issue remaining for decision is whether petitioner is subject to tax under section 531[1] with respect to all or any part of the earnings retained by it in any of the years involved herein. Findings of Fact Some of the facts have been stipulated, and the stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner is a Delaware corporation with its principal office in Amarillo, Texas. It maintains its books and records and files its Federal income tax returns on the basis of a fiscal year ended April 30. For its taxable years 1956 through 1958, it timely filed its income tax returns, prepared on the accrual method, with the district director of internal revenue at Dallas, Texas. Shortly after its incorporation on April 27, 1955, *233 petitioner, in a tax-free reorganization, acquired the assets and assumed the liabilities, of the following corporations, which were then dissolved: Date of Incor-
Name
poration
Mead's Bakery, Inc., Amarillo,
Texas
May 18, 1946
Mead's Bakery, Inc., Lawton,
Oklahoma
June 5, 1946
Mead's Fine Bread Company of
Big Spring, Big Spring, Texas
Oct. 7, 1946
Mead's Fine Bread Company of
El Paso, El Paso, Texas
Mar. 20, 1948 (These corporations will hereinafter sometimes be referred to as the predecessor corporations.) Petitioner's stock was then distributed to the stockholders of the predecessor corporations. At all times relevant hereto, E. P. Mead, petitioner's president, owned approximately 60 percent of the outstanding stock in petitioner. Similarly, Ed V. Mead, petitioner's vice-president and the son of E. P. Mead, owned approximately 31 percent of petitioner's outstanding stock. The remaining stock in petitioner was held by other members of the Mead family during the period in question. Plans for Expansion and Diversification The Mead family has been engaged in the business of manufacturing and distributing bread on a wholesale basis in the southwestern part of the United States since at least 1938. *234 From that time to date, their activities in this business reflect sustained growth, expansion and diversification. Starting out originally as a sole proprietorship and later conducting their business in the form of the four predecessor corporations which petitioner absorbed in 1955, the Meads acquired 21 bakery plants between 1938 and May 1, 1955. Fourteen of these plants were acquired between 1946 and May 1, 1955. In 1950, petitioner's four predecessor corporations employed a total of 524 persons. In 1955, petitioner had 1,037 employees. During the years in issue, the course pursued by petitioner with regard to expansion remained the same. As of May 1, 1955, the equipment in many of petitioner's plants was obsolete, worn out, and in need of replacement. The acquisition of the 14 plants by the predecessor corporations between 1946 and May 1, 1955, had depleted their earnings and adversely affected their ability to add to and replace equipment during the period from 1946 to 1955. Thus, for example, in March 1955, shortly before the reorganization occurred, one of the predecessor corporations acquired a large bakery plant in Oklahoma City, Oklahoma. Petitioner's management estimated *235 as a rule of thumb that in the acquisition of new plants it would incur losses approximately equal to acquisition cost before being able to place the new plants on a profitable basis. Between the time the Oklahoma City plant was acquired and April 30, 1958, petitioner, in fact, lost $423,644.89 in connection with its operation. The capital stock and earned surplus of the predecessor corporations before the May 1, 1955, reorganization and that of petitioner immediately subsequent thereto, were as follows: Before Reor-
After Reor-
ganization
ganization
Capital Stock
$1,265,000.00
$2,593,115.20
Earned Surplus [1]
1,328,115.20
$2,593,115.20
$2,593,115.20
Petitioner's average cash balance for the four weeks ended July 21, 1955, was $150,293.76. [2] Petitioner found this amount of cash insufficient for purposes of conducting its business. Thus, it was forced to borrow funds to obtain the requisite working capital. Throughout its entire existence, petitioner has experienced great diffculty in obtaining adequate credit and financing. On September 12, 1955, petitioner borrowed a total *236 of $400,000 from two banks. In order to obtain these loans, it was required (1) to give a chattel mortgage on all of its trucks and baking equipment, and (2) to agree that it would not acquire or construct any additional bakeries or related buildings or facilities without prior permission from the banks. These loans proved unduly restrictive. On February 1, 1956, petitioner refinanced them with a $600,000 loan from The Penn Mutual Life Insurance Company (hereinafter referred to as the Penn Mutual loan). Although the terms of the Penn Mutual loan were somewhat less stringent than those of the bank loans, nevertheless, petitioner found them confining. The Penn Mutual loan contained *237 restrictions against petitioner's incurring any indebtedness other than (1) the Penn Mutual loan, (2) indebtedness incurred in connection with the purchase of equipment, but not to exceed an aggregate of $150,000 at any time outstanding, and (3) unsecured bank loans maturing within 12 months and not exceeding $400,000. Petitioner was unable to borrow from banks on unsecured loans. Thus, petitioner was, in effect, prevented by the terms of the Penn Mutual loan from expanding by means of debt financing. This loan also prohibited petitioner from acquiring any new corporations or assets by merger, or in return for the issuance of its stock. The loan agreement also prevented petitioner from acquiring any subsidiaries in addition to Mead's Angus Mesa, Inc. Thus, for the period during which the Penn Mutual loan was outstanding, the only means by which petitioner could finance the acquisition of new plants, diversification into new lines of business, or the purchase of equipment to any substantial extent was by the retention of earnings. Petitioner's average four week cash balances for the fiscal year ended April 30, 1956, was $360,283.37. The major portion of this amount consisted of $281,000 *238 representing proceeds from the Penn Mutual loan. Its average cash balance for the four weeks ended March 1, 1956, excluding the Penn Mutual loan from proceeds, was $40,733.86. This amount would have been insufficient to enable petitioner to conduct its operations for one day. As previously indicated, during the years in issue, petitioner steadily expanded its activities in the bakery business. Between May 1, 1955, and April 30, 1956, it added some 41 new delivery routes to service Oklahoma City, Ada, and Tulsa, Oklahoma. The initial expense of adding a new route is $5,000, which includes a truck and a 12-week training period for the delivery man. Development costs for the new route, including additional consumption of supervisor time and more stale, unsold bread to be picked up from the stores on the route, result in losses of approximately an additional $5,000 per route for the first year of operation. Because of the large growth of population in the cities in which petitioner's principal bakeries were located, new routes had to be continuously developed to meet competition. In order to keep up with its competition, rising costs and the increasing population of the areas it served, *239 petitioner was forced to expend considerable sums for replacing old equipment and purchasing new equipment. During the years in issue petitioner spent a total of approximately $1,400,000 for additions to its existing plants and equipment. The cost of these additions exceeded depreciation allowed during this period by approximately $170,000. The bakery business has been subject to dramatic innovations. Some of those which influenced petitioner's management to retain its earnings in order to be able to produce or utilize these innovations were: (1) "Brown and Serve" rolls; (2) "diet bread"; (3) "round bread"; and (4) the use of plastic "end seals" in wrapping loaves of bread. Thus, the use of such new products and devices required petitioner to spend substantial amounts for advertising and new equipment such as pans and other machinery. One of the most significant innovations in the baking industry in recent years has been the development of the continuous mix method of making bread. This is an automated process which produces bread of a better taxture and quality at a cost of approximately 10 to 15 percent less than the conventional methods. In 1953, E. P. Mead made a trip to New Jersey *240 to inspect a bakery plant that had converted to the continuous mix method of manufacturing bread. Although the basic equipment for this process did not become available in the areas in which petitioner's plants were located until some time in 1958, petitioner had, by 1956, made definite plans to begin converting its ten largest bakery plants to the continuous mix process at such time as the equipment could be obtained. Thus, in 1956 petitioner began to set aside a portion of its earnings to effect these plans. The estimated average cost of purchasing and installing the necessary equipment was $150,000 per plant. In 1958, when the machinery became available in the areas in which petitioner operated, it began to conduct active negotiations with Baker Process Company and American Machine & Foundry Company, two companies which manufactured and installed continuous mix equipment. Petitioner actually converted two of its plants in 1961 and another in 1962, at an aggregate cost of $451,125.32. During the years in issue petitioner had definite plans for the acquisition of additional bakeries and for diversification into related businesses. Between March 7, 1956, and November 14, 1958, petitioner *241 conducted active negotiations to purchase 12 bakery plants, one refrigerated biscuit plant, and one ice cream plant. Petitioner made offers on 10 of these plants. As a direct result of these negotiations, petitioner did, in fact, purchase 4 of these plants, as follows: Date of Pur-
Purchase
Bakery
chase
Price
Whittaker Bakery, Sweetwater, Texas
10/ 6/58
$ 14,000.00
Bakery in Deming, New Mexico
5/16/59
30,000.00
May's Bakery, Farmington, New Mex
8/12/59
38,452.79
Calcasieu Baking Co., Lake Charles, La.
9/17/59
337,235.60
Total Cost
$419,688.39
In addition to its plans for purchasing additional bakery plants during the years herein involved, petitioner also had specific plans for constructing new plants in Tucson, Arizona, and Ada, Oklahoma. Petitioner had in its possession standard architectural plans which it expected to use in erecting these bakeries. For the Tucson plant, it had estimated construction cost of $100,000 and costs for equipping the plant of $250,000. It had also estimated construction costs of $100,000 for the Ada plant and an additional $150,000 for equipment. Although petitioner acquired a plant site in Tucson on March 13, 1958, it later abandoned the project after the years in issue *242 because a competitor that already serviced that market announced that it was opening a plant in Tucson. Although petitioner purchased the site for a new plant in Ada, Oklahoma, in October 1957, it abandoned plans for constructing this plant in 1961 because its other plant in that town was not operating as profitably as had been expected. Petitioner during the years involved herein also had definite plans for diversification into the business of manufacturing and distributing potato chips and frozen baked products. It believed that the adoption of these two lines would be advantageous because it already possessed a ready-made system which could distribute these additional products without any increase in overhead. It also believed that since the consumption of refrigerated biscuits directly cut into the bread market, it should expand into the biscuit business to protect its share of the market. Because of the aforementioned restrictions in the Penn Mutual loan agreement, petitioner was prevented during the years in issue from directly entering such new lines of business. However, petitioner was able to enter the potato chip business indirectly when E. P. Mead and Ed V. Mead, on January *243 30, 1957, organized Mead Co., Inc. [3] Mead Co., Inc. produced potato chips which it supplied to petitioner for distribution. At all times relevant hereto, it was contemplated that petitioner would acquire the stock of Mead Co., Inc., after it had either paid or refinanced the loan from Penn Mutual. On September 14, 1961, after petitioner obtained a loan of $1,350,000 from Republic National Bank of Dallas and repaid the Penn Mutual loan, it purchased from E. P. Mead and Ed V. Mead, at their cost, all of the outstanding stock in Mead Co., Inc., for $402,863.62. On September 14, 1961, petitioner also purchased all of Mead's Frozen Foods, Inc., for $97,727. Mead's Frozen Foods, Inc., was organized on September 3, 1958, by E. P. Mead and two other individuals, who were potential customers of this corporation, to engage in the manufacture and sale of frozen rolls and biscuits. Mead's Frozen Foods, Inc., was organized to permit petitioner to enter into this line of business without violating the restrictive covenants of the Penn Mutual *244 loan. It had been contemplated that petitioner would acquire direct control of this business when it was free of the conditions imposed by said loan agreement. Petitioner, also on September 14, 1961, purchased from E. P. Mead at his cost, $66,326.94, all of the outstanding stock in Bakers Merchandise Company, Inc., Amarillo, Texas. This company was engaged in the business of manufacturing and selling bread. Other Reasons for Retaining Earnings Several other reasons caused petitioner to retain its earnings in this period. One such reason was the threat of reduced profits because of price cutting by chain stores which, in addition to their retail trade, operated bakeries. Another reason was to create a reserve against losses that might be incurred in connection with possible labor disputes. Although petitioner experienced no strike or other such work stoppage in any of its plants between 1950 and 1959, losses due to such disputes were a reasonable factor for petitioner's management to consider. In 1949 the El Paso and Albuquerque plants were closed because of strikes. In 1960 its Oklahoma City plant was closed because of a strike and in 1962 its Jeffersonville, Indiana, plant was subject *245 to a prolonged strike. In order to retain the market served by that plant, petitioner transported bread from its plant in Abilene, Texas, and incurred related expenses of approximately $450,000. Although a portion of petitioner's sales was on a cash basis, an increasing number were being made on credit, either on weekly or 30-day payment terms. There was a trend in the baking industry toward more credit and larger receivables. Petitioner's management had estimated during the years in issue that trade accounts receivable would increase between 20 and 25 percent per year. Petitioner's total accounts receivable in 1956 were $487,000 as compared to $730,000 in 1959. They have continued to increase since that time. Unrelated Securities Investments Petitioner, in the period before us, was faced with contingent liabilities in excess of $385,000 arising because of tax deficiencies asserted against the four corporations absorbed by it, interest thereon, and estimated expenses related thereto, including legal and accounting fees. As reserve against this contingency, petitioner purchased in 1956 securities consisting of U.S. Government bonds, Series F, at a cost of $17,031.11 and common stock *246 in the First State Bank of Amarillo at a cost of $5,100. In 1957 and 1958 it purchased additional stock in this bank at a cost of $16,000 and $38,930. In 1958, petitioner also acquired common stock in Citizens National Bank, Abilene, Texas, at a cost of $11,280. [4] *247 During the years in issue petitioner maintained a portion of its assets in the form of time deposits. As of April 30, 1956, these amounted to $150,000. By April 30, 1957, these increased to $250,000 and to $421,000 as of April 30, 1958. In part, these time deposits were held as to reserve for the contingent tax liability. The proposed tax deficiencies were finally determined to be $149,393.66, per Tax Court decision of November 10, 1959. In addition to that amount, petitioner paid interest thereon, and also attorneys' fees in the amount of $26,000. Petitioner sold its stock in First State Bank of Amerillo on August 20, 1959, for $251,650, realizing a gain of $138,430, and used a portion of these proceeds to pay these amounts. Advances to Corporation Owned by Principal Stockholder In the period involved herein, petitioner leased a number of warehouses or bakeries occupied by it from Mead's Industries, Inc. E. P. Mead owned 99 percent of the stock of this corporation during the period before us. In order to conserve working capital and to present a more favorable balance sheet, petitioner chose to occupy these buildings under leases, rather than to purchase or construct such buildings. These buildings were constructed by Mead Industries, Inc., according to petitioner's exact specifications. Accordingly, the buildings required special wiring and plumbing, oversized loading platforms, and various other unique features. These structures were, therefore, suitable solely for baking purposes. Mortgage financing could not be obtained for the installation of these special features, and petitioner found it necessary to advance to Mead Industries, Inc., approximately $80,000 for their installation. *248 [5]
Advances to Shareholders Petitioner's books reflected advances on open account to E. P. Mead in the amount of $17,000 as of April 30, 1958, and open account advances to Ed V. Mead in the amount of $9,607.26 as of April 30, 1956, and $8,889.62 as of April 30, 1957. The receivable from E. P. Mead was entered on petitioner's records without Mead's knowledge in what essentially was a yearend bookkeeping transaction whereby stock owned by petitioner was transferred to E. P. Mead. This was done so as to prevent a technical violation of a covenant in the Penn Mutual loan agreement. The amount of the receivable was paid by E. P. Mead on October 16, 1958. Ed V. Mead repaid the amount loaned to him by petitioner during its fiscal year ended April 30, 1958. E. P. Mead and Ed V. Mead extended substantially more credit to petitioner than either received from it. When petitioner borrowed $400,000 from two banks in 1955, the Meads personally guaranteed petitioner's notes. When petitioner purchased E. P. Mead's stock in *249 Mead's Frozen Foods, Inc., and Bakers Merchandise Company, Inc., on September 14, 1961, a portion of the purchase price, $113,564.78 was carried in petitioner's books as a debt to E. P. Mead. Similarly, petitioner carries on its books a liability in the amount of $100,716 to Ed V. Mead for stock he transferred to petitioner on September 14, 1961, in Mead Co., Inc. Advances to Subsidiary During the years in issue petitioner owned 98 percent of the outstanding stock in Mead's Angus Mesa, Inc. (hereinafter referred to as Angus). Petitioner filed its returns with Angus on a consolidated basis. In connection with its acquisition on May 1, 1955, of the four predecessor corporations, petitioner acquired the Angus stock, which had previously been owned by one of the predecessor corporations (hereinafter referred to as El Paso). Angus was organized by El Paso on August 12, 1953, to engage in raising and breeding an elite show herd of Aberdeen Angus cattle. The cattle raising operation took place on an 1800 acre ranch owned by Angus in Albuquerque, New Mexico. Angus also owned a farm of approximately 180 acres in Albuquerque which it acquired for approximately $175,000. Ed V. Mead, formerly *250 the president of El Paso and, during the years in issue, vice-president of petitioner, resided at all times relevant hereto in a home located on the farm. After a revenue agent made an income adjustment to Angus' return in 1956 for unreported rental income of $4,200, Angus in subsequent years began to report rental income for the quarters occupied by Ed V. Mead. Immediately prior to petitioner's absorption of the four predecessor corporations, Angus possessed a herd of 100 breeding cows and a one-half interest in a prize stud bull. Angus had acquired these cattle at a cost of $129,734. Shortly after the May 1, 1955, reorganization, petitioner decided that Angus' cattle raising activities constituted too much of a drain on its working capital and that such activities should be terminated immediately and the cattle disposed of as soon as possible. The cattle were sold at auction in October 1955. Thereafter the sole activity engaged in by Angus, aside from leasing the home on its farm to Ed V. Mead and selling unneeded equipment, was to lease, on a share crop basis, a portion of its land for the cultivation of hay. Angus had the following gross receipts from the sale of hay: Fiscal Year Ended
Amount
April 30, 1956
April 30, 1957
$5,544.75
April 30, 1958
4,748.20
April 30, 1959
1,753.58
*251 Neither Ed nor any other officer of Angus or petitioner devoted any of his time to the affairs of Angus. Between the years 1955 and 1960, Angus sustained the following losses: Fiscal Year Ended
Amount
April 30, 1955
$178,607.80
April 30, 1956
104,702.32
April 30, 1957
32,699.70
April 30, 1958
20,464.91
April 30, 1959
34,174.62
April 30, 1960
21,173.47
Total
$391,822.82
During each of the years in issue, petitioner advanced substantial amounts on open account to Angus. During its fiscal year ended April 30, 1957, petitioner advanced $50,000 to Angus, and during its fiscal year ended April 30, 1958, it advanced $77,889.62. The following is a consolidated balance sheet reflecting, on a consolidated basis, the assets and liabilities of petitioner and its subsidiary, Angus, during the years before this Court. MEAD'S BAKERY, INC., AND SUBSIDIARY MEAD'S ANGUS MESA, INC. Consolidated Balance Sheet ASSETS
1958
1957
1956
Current Assets
Cash on hand and in banks
$1,211,859.33
$1,474,828.80
$ 856,245.23
Notes and accounts receivable
612,538.90
541,359.60
497,686.30
Inventories of raw materials and supplies
529,805.10
480,020.19
518,474.59
Securities
135,241.11
85,031.11
68,531.11
Prepaid expenses
35,544.38
33,852.15
22,366.86
Total current assets
$2,524,988.82
$2,615,091.85
$1,963,304.09
Fixed Assets
Property, plant and equipment
$5,201,064.72
$4,734,927.45
$4,475,094.69
Less: Depreciation reserve
(3,383,249.05)
(3,097,741.59)
(2,700,928.41)
Total fixed assets - Net
$1,817,815.67
$1,637,185.86
$1,774,166.28
Other Assets
Prepaid expenses
$ 20,146.31
$ 21,990.17
$ 20,471.53
Goodwill and revaluation of assets
202,336.71
202,336.71
202,336.71
TOTAL ASSETS
$4,565,287.51
$4,476,604.59
$3,960,278.61
LIABILITIES
Current Liabilities
Notes payable
$ 115,612.07 [1]
$ 93,321.52 [2]
$ 116,116.92 [3]
Accounts payable
484,902.20
563,373.43
483,549.92
Accrued expenses and payroll deductions
82,456.40
81,025.33
57,222.96
Provision for income tax
241,185.35
275,608.37
18,769.73
Salesmen's bond deposits and other em-
ployees' deposits
192,068.58
60,221.18
18,778.13
Total liabilities shown above
$1,180,369.64
$1,161,008.86
$ 772,093.80
Long Term Liabilities
Notes payable
$ 640,169.14 [4]
$ 664,164.43 [5]
$ 759,802.42 [6]
Capital Stock
Authorized
$2,600,000.00
$2,600,000.00
$2,600,000.00
Less: Unissued shares
0
(6,884.80)
(6,884.80)
Outstanding
$2,600,000.00
$2,593,115.20
$2,593,115.20
Minority interest in subsidiary
500.00
500.00
500.00
Earned Surplus (Deficit)
307,221.28 [7]
83,452.00 [8]
165,232.81 [9]
Total capital and surplus
$2,907,721.28
$2,677,067.20
$2,428,382.39
Less: Treasury stock at cost
(162,972.55)
(25,635.90)
0
Net capital and surplus
$2,744,748.73
$2,651,431.30
$2,428,382.39
TOTAL LIABILITIES AND CAPITAL
$4,565,287.51
$4,476,604.59
$3,960,278.61
*252 Petitioner and its affiliate, Angus, had gross income, cost of goods sold, operating expenses, and taxable income [6] for the years in question, as follows: Fiscal Year Ended
Gross
Cost of
Operating
Taxable
April 30
Income
Goods Sold
Expenses
Income
1956
$13,624,615.07
$8,758,936.80
$4,883,550.68
$ 88,155.14
1957
14,766,786.54
9,110,919.07
5,171,261.62
559,695.76
1958
15,349,339.53
9,372,904.26
5,535,485.72
488,211.24
*253 Petitioner retained all of its earnings during the years in issue. Neither petitioner nor any of the predecessor corporations has ever declared or paid a taxable dividend. During the calendar years 1956 through 1958, E. P. Mead filed joint Federal income tax returns with his wife, Jessie Mead, and reported taxable income thereon which put them in the tax bracket of 20 percent, 62 percent and 53 percent, respectively. During this same period, Ed V. Mead filed joint returns with his wife, Elizabeth Mead. They reported taxable income thereon which put them in tax brackets of 53 percent, 56 percent and 56 percent for these years. On March 21, 1961, respondent, by registered mail and pursuant to section 534, notified petitioner that respondent intended to issue a deficiency notice for the taxable years ended April 30, 1956, through April 30, 1958, based on section 531. Petitioner *254 did not submit a statement of grounds, as permitted under section 534(c). Opinion The ultimate issue for our decision is whether petitioner was availed of during its fiscal years ended April 30, 1956, through April 30, 1958, for the purpose of avoiding income taxes with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. Section 532. Under the present statutory provisions dealing with the accumulated earnings tax, unless petitioner can prove to the contrary by a preponderance of the evidence, the very fact that its earnings and profits were permitted to accumulate beyond the reasonable needs of its business is determinative of the proscribed purpose. Section 537. However, to the extent petitioner can establish that it retained all or any part of its earnings and profits to meet the reasonable needs of its business, such amount will be allowed as a credit against its accumulated taxable income [7] subject to the accumulated earnings tax. Section 535(c). Thus, it is necessary for us to consider whether petitioner's earnings and profits were, in any of the years herein concerned, accumulated beyond the reasonable needs *255 of its business. If the answer to this issue is in the affirmative, we must determine for each year in question what part of petitioner's earnings and profits, if any, has been retained for the reasonable needs of its business. Motor Fuel Carriers, Inc. v. United States, 322 F. 2d 576 (C.A. 5, 1963). Pursuant to section 537, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. Since petitioner did not submit a statement of grounds in response to the notification sent by respondent pursuant to section 534(b), petitioner must bear the burden of proving that all or any part of its earnings and profits has not been permitted to accumulate beyond the reasonable needs of its business. Petitioner also has the burden of proof as to the ultimate issue of whether petitioner *256 during the years in question was availed of for the purpose proscribed in section 532. Both issues are fact questions. Helvering v. Nat. Grocery Co., 304 U.S. 282 (1938); F. E. Watkins Motor Co., 31 T.C. 288 (1958). In determining whether petitioner's accumulations of earnings and profits in the years before us were within the reasonable needs of its business, we first must consider whether prior accumulations were, in fact, sufficient to meet petitioner's needs during the period in issue. See section 1.535-3(b)(ii), Income Tax Regs.; Electric Regulator Corporation, 40 T.C. 757, 764-765 (1963), on appeal (C.A. 2, Oct. 28, 1963); Gus Blass Co., 9 T.C. 15 (1947); and World Pub. Co. v. United States, 72 F. Supp. 886, 895 (N.D. Okla. 1947), affd. 169 F. 2d 186 (C.A. 10, 1948), certiorari denied 335 U.S. 911 (1949). Respondent points to the fact that as of May 1, 1955, the date of the tax-free reorganization in which petitioner acquired the assets of the four predecessor corporations, petitioner had accumulated earnings totaling $2,058.20. [8] *258 However, the mere size of the previously accumulated earnings and profits is not indicative that they are sufficient to cover the future needs *257 of the business. As the Court of Appeals for the Fourth Circuit noted in Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495, 500 (1960), affirming a Memorandum Opinion of this Court, certiorari denied 362 U.S. 976 (1960). the size of the accumulated earnings and profits or surplus is not the crucial factor; rather it is the reasonableness and nature of the surplus. Part of the surplus may be justifiably earmarked in the form of reserves for specific, necessary business needs. n3 Again to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity. * * * [Footnote omitted]. We believe petitioner has amply demonstrated that as of May 1, 1955, its accumulated earnings and profits in the amount of $2,058,115.20 had been so translated into plant expansion, new equipment, increased receivables, etc., and that, therefore, they were not available to satisfy any reasonable business needs that might confront petitioner during the years in issue. Our Findings of Fact contains the various factors which led us to this conclusion. One such factor is the rapid growth of the four predecessor corporations between October 1946 and May 1, 1955, whereby they acquired 14 additional plants and doubled their number of employees. Moreover, although petitioner's four-week cash balance for its fiscal year ended April 30, 1956, was $360,283.37, the major portion of this amount consisted of loan proceeds, namely, $281,000 borrowed from The Penn Mutual Life Insurance Company on February 1, 1956. Petitioner's average cash balance for the four weeks ended March 1, 1956, excluding the proceeds of the Penn Mutual loan, was $40,733.86. This amount would not have been *259 sufficient to enable petitioner to conduct its operations for one day. From this, we conclude that petitioner could not have used any portion of its earnings and profits accumulated prior to May 1, 1955, to satisfy any of its business needs that accrued during the period before us. As previously indicated, petitioner has the burden of proving that the earnings retained by it during the years in issue did not exceed its reasonable business needs. We have set forth in our Findings of Fact with some degree of particularity the various factors which petitioner claims caused it to retain all of its earnings during this period. These factors include petitioner's plans and efforts: (1) To acquire additional bakery plants; (2) to diversify into new fields, such as the production and wholesale distribution of potato chips, frozen baked goods and related products; (3) to purchase new equipment for its baking plants, including automated equipment for 10 of its plants; (4) to create a reserve against losses due to labor disputes; and (5) to increase its surplus to cope with the trend in the baking industry of extending more credit to customers and longer receivables. Because of various restrictive *260 covenants and negative pledge clauses in its loan agreement with Penn Mutual, the only manner by which petitioner could attempt to attain these ends during the years in issue was by the retention of earnings. In our opinion, petitioner has established that, at least to some extent, it permitted its earnings and profits during this period to accumulate in order to meet the reasonable needs of its business. However, the evidence petitioner presented as to the specific amount of these needs is somewhat inconclusive. Therefore, before we can determine whether, or to what extent, petitioner allowed its earnings and profits during these years to accumulate beyond its reasonable needs, we must consider several factors mentioned by respondent as indicating that petitioner did unreasonably accumulate its earnings. Included among these factors are: (1) Petitioner's advances on open account to Mead Industries, Inc. (cf. section 1.537-2(c)(3), Income Tax Regs.); (2) the amount of petitioner's securities investments during the years in issue (cf. section 1.537-2(c)(4), Income Tax Regs.); and (3) petitioner's advances on open account to its two principal shareholders, E. P. Mead and Ed V. Mead *261 (cf. section 1.537-2(c)(1), Income Tax Regs.) Reference to our Findings of Fact indicates that petitioner has clearly demonstrated that in each of the above-described instances it used its funds for legitimate business reasons and that it has rebutted any inference of unreasonable accumulations arising from such transactions. However, there is one factor mentioned by respondent which bears even more intensive scrutiny, namely, the advances made by petitioner on open account to its subsidiary, Angus, during the years in question. [9] *262 Cf. section 1.537-2(c)(3), [10] *263 Income Tax Regs.; Raymond I. Smith, Inc., 33 T.C. 141 (1959), affd. 292 F. 2d 470 (C.A. 9, 1961), certiorari denied 368 U.S. 948 (1961); Kerr-Cochran, Inc., 30 T.C. 69, 80-82 (1958). Petitioner's position in response to this is that Angus was, during these years, engaged in the business of farming and raising cattle and that this was stipulated to by respondent. Then pointing to section 1.537-3(b), Income Tax Regs., [11] *265 petitioner asserts (1) that since it owned more than 80 percent of the outstanding stock in Angus, the business of Angus should be considered as petitioner's business and (2) that petitioner was entitled to utilize its earnings for the reasonable business needs of its subsidiary, which were to pay various installments of Angus' indebtedness as they became due during the years 1956 through 1958. [12] It is petitioner's further contention that even if Angus were not actively engaged in a business, since petitioner filed its returns on a consolidated basis with Angus, it was, nevertheless, entitled to a consolidated accumulated earnings credit, pursuant to section 1.1502-31(a)(19), Income Tax Regs., based on the amount of its earnings retained *264 for the reasonable needs not only of its own business, but also the reasonable needs of its affiliate, Angus. We do not agree with any of petitioner's contentions relating to its advances to Angus. First of all, the evidence in the record affirmatively shows that Angus was not actively engaged in the business of cattle raising or farming during the years in issue and that, at most, it was a mere investment company. At the time petitioner acquired the stock of Angus in connection with the May, 1, 1955, reorganization, petitioner's management decided to discontinue Angus' cattle raising activities because they constituted too great a drain on petitioner's *266 working capital. The cattle were sold at auction in October 1955. Although the record leaves us unconvinced that Angus at any time ever entertained an expectation that its cattle raising activities would be profitable, it is clear that when petitioner acquired Angus, no such expectation existed. Thereafter, Angus' sole activity, aside from renting the home on its farm to Ed V. Mead and selling off unneeded equipment, was to lease, on a share crop basis, a portion of its land for the cultivation of hay. From this it derived minimal receipts. Angus sustained substantial net operating losses from the year petitioner acquired it until it was disposed of in 1960. Substantially all of the expenses claimed by Angus represented deductions for interest, depreciation, taxes, and insurance. Neither Ed V. Mead nor any other officer of Angus or petitioner devoted any of his time to the affairs of Angus. Aside from the tenant farmer, Angus had no employee during the years in issue. From the foregoing, it is our opinion that Angus did not engage in any business during this period, particularly the business of farming or raising cattle. Cf. John Randolph Hopkins, 15 T.C. 160, 169-170 (1950); Reginald C. Vanderbilt, 5 B.T.A. 1055 (1927), *267 affd. sub nom. Deering v. Blair, 23 F. 2d 975 (C.A.D.C. 1928); Thacher v. Lowe, 288 F. 994 (S.D.N.Y. 1922); Henry P. White, 23 T.C. 90 (1954), affd. per curiam 227 F. 2d 779 (C.A. 6, 1955), certiorari denied 351 U.S. 939 (1956). Angus passively continued to hold its farm and ranch land and pay the mortgage indebtedness to which the land was subject during the years involved solely as an investment. Cf. Rands, Inc., 34 B.T.A. 1094 (1936); Beim Co. v. Landy, 113 F. 2d 897, 900 (C.A. 8, 1940). As noted above, the parties stipulated that Angus, during the years in issue, was engaged in the agricultural and livestock business. This Court cannot be bound by stipulations as to law. See Ohio Clover Leaf Dairy Co., 8 B.T.A. 1249 (1927), affd. per curiam 34 F. 2d 1022 (C.A. 6, 1929), certiorari denied 280 U.S. 588 (1929); John A. Nelson Co. v. Commissioner, 75 F. 2d 696, 697 (C.A. 7, 1935), affirming 28 B.T.A. 529 (1933), reversed on another issue 296 U.S. 374 (1935); McClintock-Trunkey Co., 19 T.C. 297, 304 (1952), reversed on another issue 217 F. 2d 329 (C.A. 9, 1954); cf. Commissioner v. Ehrhart, 82 F. 2d 338 (C.A. 5, 1936), reversing a Memorandum Opinion of the Board of *268 Tax Appeals. Nor can it be bound by stipulations of fact which appear contrary to the facts as disclosed by the record. William Ernest Seatree, 25 B.T.A. 396 (1932), affd. 72 F. 2d 67 (C.A.D.C. 1934); cf. Commissioner v. Cummings; 77 F. 2d 670 (C.A. 5, 1935), reversing a Memorandum Opinion of the Board of Tax Appeals. Thus, to the extent the stipulation of facts in this proceeding provides that Angus was engaged in the agricultural and livestock business during the years in issue, it is hereby set aside. Normally, where one corporation owns 80 percent or more of the stock of another corporation, it may accumulate earnings to meet the subsidiary's need for funds. However, it may not do so if the subsidiary is a personal holding company, an investment company, or a corporation not engaged in the active conduct of a trade or business. Section 1.537-3(b), Income Tax Regs.
Moreover, the fact that petitioner filed its income tax returns on a consolidated basis with its subsidiary, Angus, does not affect this conclusion. In essence, the pertinent regulations provide that in computing the consolidated accumulated earnings tax for an affiliated group, which is not a mere holding or investment *269 group, [13] there shall be deducted from consolidated taxable income a consolidated accumulated earnings credit. Section 1.1502-31(a)(18)(vi), Income Tax Regs. The consolidated accumulated earnings credit is an amount equal to such part of the aggregate of the earnings and profits for the taxable year of the several members of the group as are retained for the reasonable needs of the business of the group, * * * Section 1.1502-31(a)(19)(i), Income Tax Regs.
Petitioner contends that for purposes of computing this credit it is permitted to consider the needs of Angus, even though Angus may not have been actually engaged in any business, in determining the reasonable needs of the business of the group. We do not believe that this is a correct interpretation of the applicable regulations. It is our opinion that, in the computation of the consolidated accumulated earnings credit under section 1.1502-31(a)(19)(i) of the Income Tax Regulations, only the reasonable needs of the operating companies *270 included in the group may be considered. Cf. sections 533(b) and 535(c)(1) and (3); and section 1.1502-3, Income Tax Regs.
Thus, in our opinion the amounts advanced to Angus during the period in issue constitute investments unrelated to petitioner's business. Petitioner has failed to prove that its reasonable business needs during each of the years in question exceeded the amount of earnings retained by it each year, minus the amount advanced to Angus on open account during such year. Thus, to the extent petitioner was able to make these advances to Angus, such funds were not required for use in petitioner's business. Moreover, petitioner has failed to prove that the amounts advanced to Angus during such years would not have been available to distribute to its shareholders as dividends. Therefore, we conclude that the advances on open account to Angus during petitioner's taxable years 1956 through 1958 represent unreasonable accumulations of surplus. However, we also conclude that during each of its taxable years 1957 and 1958, petitioner did have reasonable business needs equal to the amount of earnings retained by it during such year, minus the amount advanced to Angus in such year. *271 We have found that petitioner in each of the years before us accumulated a portion of its earnings beyond the reasonable needs of its business. This fact is determinative of the purpose to avoid the income tax with respect to its shareholders unless petitioner shall prove to the contrary by a preponderance of the evidence. Section 533. Petitioner has failed to meet its burden of proof on this ultimate issue. Moreover, there are, in addition, several factors in the record indicating that one of the purposes of the accumulations during the period before us was to shield the shareholders from taxation. Petitioner in each of the years in issue realized a substantial profit. Neither petitioner nor any of the predecessor corporations paid a taxable dividend throughout their respective existences. Moreover, if the advance had not been made to Angus during the years in issue, there would have been ample earned surplus and ample cash on hand to permit the distribution of a dividend in each of the years involved. Finally, any dividends distributed to either of the controlling shareholders (except E. P. Mead in 1956) would have been subject to tax at a rate of more than 50 percent. Thus, it is *272 our conclusion that to the extent set out herein petitioner during the period under review was availed of for the purpose mentioned in section 532(a). However, because of our finding that a portion of its earnings and profits were accumulated to meet the reasonable needs of its business during its taxable years ended April 30, 1957 and 1958, petitioner is entitled to a consolidated accumulated earnings tax credit based upon such finding. Decision will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
1. After reduction for nontaxable stock dividend of $730,000 paid by Mead's Bakery, Inc., Amarillo, Texas, on October 1, 1951.↩
2. This amount to a large extent consisted of reserves which petitioner denoted as "nonspendable funds." Such funds included reserves for accrued payrolls, petty cash, accrued taxes, and funds deposited in banks for purposes of maintaining goodwill. One such deposit was made by petitioner so that it could be identified with a bank for purposes of obtaining financing from the bank. Another such deposit was made because it was solicited by the owner of a chain of food stores that were customers of petitioner.↩
3. Until October 15, 1959, two other individuals each owned 25 percent of the outstanding stock in Mead Co., Inc. At that time E. P. Mead acquired their stock.↩
4. Aside from the purpose of providing a reserve for the contingent tax liability, the bank stock were acquired by petitioner to create goodwill. Petitioner wished to remain on good terms with the First State Bank of Amarillo for purposes of obtaining prospective financing. It purchased stock in Citizens National Bank for purposes of making "contact" with one of its major stockholders who owned a large chain of retail markets.
5. Petitioner's accounts receivable from Mead Industries, Inc., as of April 30, 1956, April 30, 1957, and April 30, 1958, were $79,167.13, $81,111.13, and $78,279.93, respectively.↩
1. Of this amount, $19,200 were current liabilities payable by Mead's Angus Mesa, Inc. ↩
2. Of this amount, $24,200 were current liabilities payable by Mead's Angus Mesa, Inc. ↩
3. Of this amount $24,612.89 were current liabilities payable by Mead's Angus Mesa, Inc. ↩
4. Of this amount, $53,511.95 were long-term liabilities payable by Mead's Angus Mesa, Inc. ↩
5. Of this amount, $102,803.68 were long-term liabilities payable by Mead's Angus Mesa, Inc. ↩
6. Of this amount, $126,732.97 were long-term liabilities payable by Mead's Angus Mesa, Inc. ↩
7. After reduction for nontaxable stock dividend on October 1, 1951, of $730,000, and after reduction for nontaxable stock distributions on consolidation of the four predecessor corporations on May 1, 1955, of $1,328,115.20. ↩
8. Same as footnote 7, supra. ↩
9. Same as footnote 7, supra.↩
6. The items of gross income, cost of goods sold, and operating expense are per petitioner's income tax returns for the years involved herein and do not reflect the adjustments made pursuant to the notice of deficiency and conceded by petitioner. However, the items of taxable income do reflect these adjustments.↩
7. In general, "accumulated taxable income" means taxable income for the year in question, minus certain adjustments (such as, for example, the Federal income taxes due thereon, and the excess of actual charitable contributions over the amount allowed as an income tax deduction less any dividends paid in the taxable year) and less the accumulated earnings credit. Sec. 535↩.
8. This figure takes into account a nontaxable stock dividend of $730,000 paid by one of the predecessor corporations on October 1, 1951 (cf. sec. 115(h), I.R.C. 1939; sec. 312(d), I.R.C. 1954; John K. Beretta, 1 T.C. 86 (1942), affd. 141 F. 2d 452 (C.A. 5, 1944), certiorari denied 323 U.S. 720 (1944), and the $2,058,115.20 earned surplus of the four predecessor corporations immediately prior to the reorganization. (Cf. Commissioner v. Sansome, 60 F. 2d 931(C.A. 2, 1932), certiorari denied 287 U.S. 667 (1932), reversing 22 B.T.A. 1171 (1931); sec. 381(c)(2), I.R.C. 1954↩.)
9. Petitioner made advances totaling $50,000 in its fiscal year ended April 30, 1957, and $77,889.62 in its fiscal year ended April 30, 1958. There is no direct evidence in the record of the amount advanced by petitioner to Angus in the fiscal year ended April 30, 1956. Respondent determined that petitioner advanced in that year no less than $364,423.52, the amount owed to it by Angus as of the end of that year. Petitioner contends that the major portion of this indebtedness represented advances made to Angus by petitioner's predecessor, El Paso, prior to the May 1, 1955, reorganization. The specific amount of El Paso's advances to Angus as of April 30, 1955, was clearly within petitioner's knowledge. Nevertheless, counsel for petitioner refused to permit the amount of these advances to be introduced into the record. The burden of proof and the burden of coming forward with evidence were on petitioner in this proceeding. Since petitioner has failed to come forward with evidence as to the amount of its advances to its subsidiary during its fiscal year ended April 30, 1956, it is our conclusion that petitioner advanced during that year no less than $88,155.14, the amount of its taxable income for that year. 10. Sec. 1.537-2(c)(3) Unreasonable accumulations of earnings and profits. Although the following purposes are not exclusive, accumulations of earnings and profits to meet any one of such objectives may indicate that the earnings and profits of a corporation are being accumulated beyond the reasonable needs of the business: (3) Loans to another corporation, the business of which is not that of the taxpayer corporation, if the capital stock of such other corporation is owned, directly or indirectly, by the shareholder or shareholders of the taxpayer corporation and such shareholder or shareholders are in control of both corporations.
11. Sec. 1.537-3(b) provides: If one corporation owns the stock of another corporation and, in effect, operates the other corporation, the business of the latter corporation may be considered in substance, although not in legal form, the business of the first corporation. However, investment by a corporation of its earnings and profits in stock and securities of another corporation is not, of itself, to be regarded as employment of the earnings and profits in its business. Earnings and profits of the first corporation put into the second corporation through the purchase of stock or securities or otherwise, may, if a subsidiary relationship is established, constitute employment of the earnings and profits in its own business. Thus, the business of one corporation may be regarded as including the business of another corporation if such other corporation is a mere instrumentality of the first corporation; that may be established by showing that the first corporation owns at least 80 percent of the voting stock of the second corporation. If the taxpayer's ownership of stock is less than 80 percent in the other corporation, the determination of whether the funds are employed in a business operated by the taxpayer will depend upon the particular circumstances of the case. Moreover, the business of one corporation does not include the business of another corporation if such other corporation is a personal holding company, an investment company, or a corporation not engaged in the active conduct of a trade or business. 12. For amounts owed by Angus to third parties (other than petitioner) on notes and mortgages, see footnotes 1 through 7 in the consolidated balance sheet of petitioner and Angus, appearing in our Findings of Fact.↩
13. Petitioner and its affiliate, Angus, do not constitute a mere holding or investment group because less than 80 percent of the consolidated gross income of the group constitutes personal holding income.↩