Frederick A. Purdy and Seena H. Purdy v. Commissioner.
Purdy v. Commissioner
Docket No. 3618-64.
United States Tax Court
T.C. Memo 1967-82; 1967 Tax Ct. Memo LEXIS 178; 26 T.C.M. (CCH) 409; T.C.M. (RIA) 67082; April 20, 1967
Eugene Blanc, Jr., 342 Madison Ave., New York, N. Y., for the petitioner. Bernard Goldstein, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion *179 DAWSON, Judge: Respondent determined deficiencies in the income taxes of petitioners in the amounts of $65,465.22 and $74,361.10 for the taxable years 1959 and 1960, respectively. Respondent also determined an addition to tax under the provisions of section 6653(a), Internal Revenue Code of 1954[1] in the amount of $3,944.92 for the taxable year 1959. The parties have stipulated that petitioners are not liable for the addition to tax for 1959 and have agreed with respect to certain other adjustments. Consequently, the only issues remaining for our decision are: 1. Whether the amounts of $45,467.78 and $64,550 withdrawn by petitioner Frederick A. Purdy in the years 1959 and 1960, respectively, from Court Chambers Corporation, his wholly owned corporation, were dividends to him pursuant to sections 301 and 316. 2. Whether losses, totaling $50,365 and $54,031.02, claimed by petitioners in their 1959 and 1960 income tax returns with respect to the operation of two sole proprietorships were incurred in a "trade or business," *180 as such term is used in sections 162(a) and 165(c). Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. General Findings Frederick A. Purdy (hereinafter referred to as petitioner) and Seena H. Purdy (who is a party to this action only by virtue of having filed joint Federal income tax returns with her husband) resided in New York, New York, at the time they filed their petition herein. Their joint income tax returns for the calendar years 1959 and 1960 were filed with the district director of internal revenue for the Manhattan District in New York City. The petitioner is, and has been for many years, in the real estate business. His real estate operations have been carried on through various corporations. During 1959 and 1960 the petitioner was the sole or at least 50-percent shareholder and the salaried president of the following corporations, [2] all of whose principal places of business were at 342 Madison Avenue, New York City: 1. Court Tower Corporation (hereinafter referred to as Tower), owner-lessor of the building and land located at 66 Court *181 Street, Brooklyn, New York. 2. Court Chambers Corporation (hereinafter referred to as Chambers), lesseeoperator of the building owned by Tower and located at 66 Court Street, Brooklyn, New York. 3. Madison Frontage, Inc., [3] managing agent for Chambers of the above-mentioned property. 4. Fifth Madison Corporation, owner of the Candian Pacific Building at 342 Madison Avenue, New York, New York. 5. 340 Madison Avenue Corporation, owner of the building located at 340 Madison Avenue, New York, New York, which is adjacent to the south side of 342 Madison Avenue. 6. Betby Corporation, owner of the building located adjacent to the north side of 342 Madison Avenue, New York City. 7. Herbert McLean Purdy Management Corporation (hereinafter referred to as Management), managing agent for the three buildings owned by Fifth Madison Corporation, 340 Madison Avenue Corporation, and Betby Corporation (and apparently *182 others), which three buildings made up the entire block-front between 43rd and 44th Streets on the west side of Madison Avenue, New York City. Petitioner reported total salaries from his corporations for the years 1959 and 1960 as follows: Corporation
1959
1960
Fifth Madison Corp.
$ 26,500
$26,500
Herbert McLean Purdy Mgt.
Corp.
30,000
30,000
Court Chambers Corp.
15,000
13,750
Court Tower Corp.
4,800
4,800
Betby Corp.
* 18,000
340 Madison Ave. Corp.
* 18,000
Madison Frontage, Inc.
5,296
Total
$112,300
$80,346
Petitioner withdrew amounts designated as loans from Chambers totaling $45,467.78 and $64,550 in the calendar years 1959 and 1960, respectively. Petitioner is, and was during the years 1959 and 1960, the sole proprietor of Purdy Door-Operator Company (certificate of doing business in New York filed in 1946), hereinafter referred to as Door Operator, and Garage-Boy Company (certificate of doing business in New York filed in 1952), hereinafter *183 referred to as Garage Boy, both of whom were on the cash receipts and disbursements method of accounting and both of whose principal offices were at 342 Madison Avenue, New York, New York. These two companies were connected with petitioner's continuing activities over three decades to develop and successfully market an efficient, inexpensive automatic garage door operator for private residence garages. Door Operator carried on the activities with respect to the development and sales of an automatic garage operator at a leased shop located at 3554 Webster Avenue, Bronx, New York. Garage Boy was created to handle the development of an electronic communicator to control the automatic garage door operator, which had previously been designed to be controlled by mechanical means. Its activities were conducted in leased space in Ardsley, New York. Petitioner reported the following losses from the two sole proprietorships as trade or business losses in his Federal income tax returns for 1959 and 1960: Purdy Door-Operator
Company
$37,993.95
$39,758.29
Garage-Boy
Company
12,371.25
14,272.78
Total
$50,365.20
$54,031.07
Findings of Fact Relating to Issue 1 *184 In early 1959 the petitioner applied to Manufacturers Trust Company (the predecessor of Manufacturers Hanover Trust Company and hereinafter referred to as the Bank) for a series of loans to Chambers. For its fiscal year ended April 30, 1959, Chambers showed on its books as accounts due from related corporations an amount in excess of $287,000, substantially all of which was due from Management. However, at that time Management, as well as a number of petitioner's other interests, was half owned by the estate of petitioner's brother with which litigation concerning the management of the corporations and the dissolution and receiverships thereof was then in progress. The Bank agreed to loan Chambers money only on the condition that petitioner and his wife provide not only their personal guarantees but also sufficient collateral to cover the entire amount of any loan. Thereupon the Bank made a series of short-term loans (on apparently all of which the interest was prepaid) to Chambers, beginning with a loan of $7,500 on May 14, 1959. From May 14, 1959, to May 12, 1965, the Bank renewed and increased the loans to Chambers, and obtained regular payments from Chambers until May 12, 1965, when *185 the final loan balance was repaid. The amounts of the loans varied from the original $7,500 to a high of $164,000 on September 18, 1962. Each of the loans, renewals, reductions and increases was evidenced by a new promissory note, each of which was endorsed personally by petitioner, his wife, or both of them and most of which were also endorsed on behalf of Tower. There were 109 notes in all, each ultimately stamped "Paid" by the Bank. Each note provided, among other things, that upon the occurrence with respect to any maker endorser or guarantor hereof of any of the following * * * default in payment or performance of this note or any obligation to, or acquired in any manner, by Payee; or if at any time in the sole opinion of the Payee the financial responsibility of any of them shall become impaired or unsatisfactory to the Payee, this note and all other obligations direct or contingent of such maker or endorser hereof to Payee shall become due and payable immediately, without notice or demand. [Emphasis supplied.] In connection with the loans the petitioner and his wife executed a series of guarantees. Each of these was entitled "Guarantee of all Liability with Collateral. *186 " The first guarantee was dated May 13, 1959. Each guarantee provided in part that the guarantor "hereby guarantees to bank, its successors, subsidiaries and endorsees and assigns the prompt and unconditional payment of claims of every nature and description to bank against the borrower." Each guarantee also contained the following paragraphs: Bank may sell all or any part of the collateral security deposited or pledged for said Liabilities, although said Liabilities may be contingent or unmatured, whenever in its absolute and unrestricted discretion Bank considers such sale necessary for its protection. * * *
If Guarantor shall fail to perform any agreement contained herein or contained in any security document or other agreement delivered by Guarantor to Bank (and the opinion of Bank as to the existence of such failure of performance shall be conclusive and binding upon Guarantor) or if default occurs in the punctual payment of any sum payable upon any of said Obligations or said Liabilities or said collateral security, * * * or if the condition or affairs (financial, business or otherwise) of any of them shall so change as to the opinion of Bank (whose opinion shall be *187 conclusive in the matter) shall impair its security or increase its credit risk, or if Bank otherwise deems itself insecure, then, in any of those events, the said Liabilities although not yet due shall without notice or demand, forthwith become and be immediately due and payable, notwithstanding any time or credit allowed under any of the said Liabilities or under any instrument evidencing the same. [Emphasis supplied.] The dates of the guarantees and the collateral referred to therein were as follows: (a) May 13, 1959: "Bank" Passbook 51198, balance $32,500. (b) June 15, 1959: Above passbook plus 2401 shares of Class A stock of Fifth Madison Corporation and 23 scrip certificates of Fifth Madison Corporation totaling $32,773.53 face value. (c) June 15, 1959: no collateral listed. (d) April 29, 1960: All of the above collateral plus mortgage dated December 8, 1959. (e) October 20, 1960: All of above collateral, however the passbook balance at this point totaled $84,118.51. (f) September 1, 1964: All of above collateral plus 200 shares of General Electric Corporation. (g) September 15, 1964: All of above collateral plus 200 shares of General Electric Company, except *188 that the passbook balance was reduced to $147.59 by a withdrawal of $124,000 on December 18, 1963, which resulted in a reduction of Chamber's loan balance by that amount, to wit, from $154,000 to $30,000. In connection with the original loan and various renewals and increases thereof, petitioner delivered to the Bank a certified public accountant's financial statement of Chambers for each of the fiscal years ended April 30, 1959, 1960, 1961, 1962, 1963, and 1964. The financial statements show, among other things, the following: Fiscal
Amounts Due
Year
From Officers
Ended
Profits
& Affiliated
Earned
Cash in
4-30
Cash
(Losses)
Companies
Surplus
Banks
1959
$ 439.25
$ (433.47)
[1] $287,964.78
$172,802.38
$ 429.35
1960
990.02
8,258.55
385,669.16
481,060.93
990.02
1961
3,078.68
( 5,961.08)
384,557.56
175,099.85
3,078.68
1962
984.88
(50,684.65)
434,571.46
125,102.74
984.98
1963
379.35
(83,749.59)
392,382.49
41,353.15
379.35
1964
3,888.10
(31,458.34)
292,807.56
9,984.81
3,888.10
*189 From May 1959 to December 1963, petitioner caused Chambers to transfer to him the following amounts: 1959
1960
1961
1962
1963
January
$7,300.00
$4,750.00
$4,000.00
$4,200.00
February
5,900.00
5,100.00
5,700.00
4,500.00
March
6,975.00
7,825.00
7,300.00
2,000.00
April
4,975.00
6,700.00
3,700.00
May
$10,800.00
6,850.00
2,500.00
9,600.00
June
4,400.00
5,400.00
4,400.00
July
3,700.00
4,900.00
4,500.00
5,800.00
August
7,725.00
5,850.00
September
6,350.00
1,500.00
October
5,642.78
6,850.00
7,500.00
November
4,200.00
3,450.00
1,200.00
7,700.00
December
9,000.00
5,000.00
3,700.00
The foregoing were all treated as loans receivable from the petitioner on the books and records of Chambers and petitioner had every intention of repaying them. A comparison, month by month of month-end borrowing balances by Chambers from the Bank, and the month-end borrowing balances by petitioner from Chambers is produced below: Borrow-
Borrow-
ings by
ings by
Petitioner
Month
Chambers
from
1959
from Bank
Chambers
May
$ 21,000.00
$10,800.00
June
55,000.00
15,200.00
July
55,000.00
18,900.00
August
55,000.00
26,625.00
September
70,000.00
26,625.00
October
75,000.00
32,267.78
November
90,000.00
36,467.78
December
100,000.00
45,467.78
Net Total for Year
$100,000.00
$45,467.78
1960
January
$ 94,700.00
$52,767.78
February
89,400.00
58,676.78
March
84,100.00
65,642.78
April
113,000.00
65,367.78
May
113,000.00
72,217.78
June
107,000.00
77,617.78
July
101,000.00
82,517.78
August
95,000.00
88,367.78
September
89,000.00
94,717.78
October
112,000.00
101,567.78
November
105,000.00
105,017.78
December
98,000.00
110,017.78
Net Total for Year
$ 98,000.00
$69,800.00
*190 The above figures have been computed without taking into account any repayments made by petitioner during the years before us. On March 28, 1960 (at approximately the end of Chambers' fiscal year), petitioner executed and delivered to Chambers his demand, interest-bearing (six percent) promissory note in the sum of $60,000. At that time the month-end balance due from him to Chambers was $65,642.68. The note, in a round sum, was intended to cover the approximate amount of petitioner's borrowings from Chambers at a point near the end of its fiscal year. On April 5, 1961 (again approximately at the end of Chambers' fiscal year), petitioner executed and delivered to Chambers his demand, interest-bearing (six percent) promissory note in the amount of $70,000. These two notes, totaling $130,000, approximated the total amount of petitioner's borrowings at that time (on May 1, 1961, the balance was $134,392.78), and were intended by petitioner to formally evidence his borrowings, subject to determination of the precise figure "as the auditor may have turned it out somewhat later." The accounting records of Chambers contained a ledger page entitled "Fred'k A. Purdy Account No. 2-A." This *191 showed the amounts owed by petitioner and correlate with his testimony and the notes he signed. The certified public accountant's statement for each of Chambers' fiscal years ended April 30, 1960 through 1966, carried an account entitled "Due from Officers and Affiliated Companies" which included the amounts shown by the ledger page. In the franchise tax reports made by Chambers to the State of New York for the fiscal years ended April 30, 1959, 1960, and 1961, each of which is signed by the petitioner, there is a schedule entitled "Balance Sheet & Computation of Capital." Line 3 of that schedule calls for a statement of "Notes & Accounts Receivable." For the fiscal years ended April 30, 1960 and 1961, the amounts so reported included the amounts shown on the accountant's report in the account "Due from Officers and Affiliated Companies." For 1960, the tax was calculated in Schedule 1 on net income at 5 1/2 percent. However, in 1961, a loss year, the tax was computed on the total capital at.001 percent. Thus the inclusion in capital of the loans to petitioner increased the tax owed by Chambers to the State of New York. On January 7, 1960, petitioner endorsed a check in the amount *192 of $14,700 to Tower. This check represented his net salary from Management for the previous 6 months. This sum was applied by Tower in partial payment of a quarterly mortgage payment which was Chambers' ultimate obligation. This sum was in partial repayment of petitioner's debt to Chambers. In April 1960, petitioner transferred the sum of $5,250 to Chambers which was in partial repayment of his debt to Chambers. On April 6, 1960, petitioner endorsed a check in the amount of $14,844 to Tower. This check represented petitioner's net salary from Management for the previous 6 months. This sum was applied by Tower in partial payment of a quarterly mortgage payment which was Chambers' ultimate obligation. This sum was in partial repayment of petitioner's debt to Chambers. In July 1961, petitioner transferred the sum of $17,250 to Chambers which was in partial repayment of his debt to Chambers. On June 3, 1963, petitioner gave his personal check to Chambers in the amount of $6,776.81. On this check was typed "Against Interest on Notes." This sum was in partial repayment of petitioner's debt to Chambers. On December 17, 1963, petitioner issued his personal check to Chambers in the *193 amount of $84,000 on which was typed the legend "Principal and Interest upon Promissory Note." This sum was used by Chambers in partial repayment of its loan balance with the Bank. This sum was in partial repayment of petitioner's debt to Chambers. On or about December 17, 1963, the petitioner transferred another $40,000 to Tower, which in turn transferred the amount to Chambers. Such amount was then applied against the loan balance of Chambers with the Bank. This sum was in partial repayment of petitioner's debt to Chambers. The $124,000 mentioned in the previous two paragraphs was the amount (all of which were petitioner's and his wife's personal funds) that the Bank allowed petitioner to withdraw from the account represented by the passbook he had placed with the Bank as collateral for Chambers' loan so that the money might be applied against the loan balance due on Chambers' borrowings from the Bank. Thus the total amount of direct or indirect repayment by petitioner to Chambers at the end of the calendar year 1963 was $182,820.81. The petitioner reported his gross salary of $30,000 from Management for the year 1959 on his income tax return for that year, the net amounts of *194 which were represented by the checks he endorsed to Chambers. A large percentage of the amounts borrowed by petitioner from Chambers were advanced to petitioner's sole proprietorships Door Operator and Garage Boy to cover their expenses. Chambers has not formally declared or paid a dividend since its incorporation and did not accrue on its books of account interest on its loans to petitioner. Findings of Fact Relating to Issue 2 For a number of years petitioner has endeavored to perfect and successfully market an inexpensive garage door operator. He has formed two sole proprietorships, Door Operator and Garage Boy, which have devoted themselves entirely to accomplishing petitioner's objectives. The Door Operator shop, located in Bronx County, New York, was a fully equipped machine shop containing all the equipment and inventory of parts necessary to build and test garage door operators. Door Operator had eight employees during the year 1959, with a total payroll of $34,508.38, and seven employees during the year 1960, with a total payroll of $33,907.84. Petitioner employed each person himself after reviewing their professional and technical qualifications. His employees *195 were covered by Workman's Compensation and Employees Liability Policies. Petitioner also had a Manufacturers and Contractors schedule liability policy. At Garage Boy's shop one employee performed the electronic phases of petitioner's research. Petitioner had to separate the operations because the electronic work required dust-free air. In the course of developing his business the petitioner applied for a number of patents, more than a dozen of which are in evidence. The first patent was issued on August 16, 1938, and the last one on April 26, 1966. These patents covered designs and components which were used in connection with the manufacturing and design phases of petitioner's continuing development of a better garage door operator. Petitioner conducted the administrative phases of his business from the office at 342 Madison Avenue and devoted all of his weekends solely to the affairs of his two sole proprietorships. Petitioner is an extremely hard-working individual and over the years he has consistently worked a 10 to 14 hour a day. On the days he could not visit the shop in the Bronx he was in frequent telephone contact with his employees. In 1946, petitioner obtained from *196 the City of New York Department of Finance a "Certificate of Authority to Collect City Sales Tax and/or Compensating Use Tax." This was in the name of "Frederick A. Purdy F/A PURDY DOOR OPERATOR COMPANY." It gave the address of 342 Madison Avenue and also 3554 Webster Avenue, Bronx. This certificate was required by Chapter 41 of the Administrative Code of the City of New York. Petitioner had a regular letterhead printed which was used in the business of Door Operator. Each of the sole proprietorships had its own bank account and had regular business checks printed. Each of the sole proprietorships kept regular and separate books of account. The books contain 16 columns, the first being a date column, the second a column for identification of items and names, and the remainder being variously titled to show deposits, materials, tools and equipment, payroll and other taxes, and other items normally necessary for conducting a business. In 1959, petitioner was actively engaged in making contact with various companies to arrive at commercial agreements for sale, distribution, and other means of marketing the product of his business. These efforts included a trip to the Midwest to see *197 eight different manufacturers of garage doors and door operators. Petitioner's final visit was to Berry Door Corporation, Detroit, Michigan, where a number of tests were run which proved generally satisfactory to the manufacturer. Berry Door Corporation was the largest manufacturer of garage doors for residences in the world at that time. After the tests were completed, Berry Door Corporation was purchased by Stanley Works, New Britain, Connecticut, and negotiations were cut off and never resumed. In 1960, Door Operator made approximately 15 sales in the approximate amount of $1,417.23. In 1961, Door Operator made approximately 26 sales in the approximate amount of $2,326.40. These sales were bona fide, some made on credit, evidenced by invoices and were made variously by petitioner, some of his employees, and his daughter. However, petitioner had no salesmen "as such." The losses in connection with Door Operator and Garage Boy reported by petitioner in his income tax returns for 1951 through 1962 were as follows: Purdy Door
Garage-Boy
Total
1951
$ 9,836.52
$ 9,836.52
1952
3,534.06
$ 1,027.41
4,561.47
1953
7,194.37
6,285.44
13,479.81
1954
20,020.73
12,892.16
32,912.89
1955
22,592.35
11,369.17
33,961.52
1956
15,783.21
13,104.05
28,887.26
1957
13,989.81
8,536.89
22,526.70
1958
20,062.54
9,139.99
29,202.53
Subtotal
$113,013.59
$ 62,355.11
$175,368.70
1959
37,993.95
12,371.25
50,365.20
1960
39,758.29
14,272.78
54,031.07
Subtotal
$190,765.83
$ 88,999.14
$279,764.97
1961
33,302.95
11,201.79
44,504.74
1962
25,096.98
6,486.53
31,583.51
Total Claimed Losses
$249,165.76
$106,687.46
$355,853.22
*198 For the following years the petitioner reported in his income tax returns gross receipts from Door Operator and Garage Boy in the following amounts: Purdy Door
Garage-Boy
Total
1951
$ 2,051.44
$ 2,051.44
1952
1,403.05
$ 380.00
1,783.05
1953
1,839.40
322.50
2,161.90
1954
1,317.85
166.02
1,483.87
1955
1,054.77
392.67
1,447.44
1956
196.18
67.59
263.77
1957
548.00
173.00
721.00
1958
253.00
102.50
355.50
Subtotal
$ 8,663.69
$ 1,604.28
$ 10,267.97
1959
228.46
74.23
302.69
1960
2,092.08
481.00
2,573.08
Subtotal
$ 10,984.23
$ 2,159.51
$ 13,143.74
1961
3,452.27
800.00
4,252.27
1962
2,278.83
200.00
2,478.83
Total
$ 16,715.33
$ 3,159.51
$ 19,874.84
Ultimate Findings 1. The notes dated March 28, 1960, and April 5, 1961, delivered by petitioner to Chambers were genuine instruments of indebtedness which were intended to secure the approximate year-end balances of petitioner's borrowings from Chambers. Petitioner intended to repay the loans from Chambers at the time each was made in 1959 and 1960. 2. During the years 1959 and 1960 the petitioner was engaged in a trade or business for profit in the operation *199 of Door Operator and Garage Boy. Opinion 1. Withdrawals from Chambers Corporation. Respondent contends that the withdrawals by petitioner from Chambers during the years 1959 and 1960 constituted taxable dividends to him. To the contrary, the the petitioner claims that the withdrawals were bona fide loans which he fully intended to repay. There is no dispute that petitioner received the withdrawals. Whether the withdrawals were loans or taxable income to him is a question of fact. Wiese v. Commissioner, 93 F. 2d 921 (C.A. 8, 1938), affirming 35 B.T.A. 701 (1937), certiorari denied 304 U.S. 562 (1938), rehearing denied 304 U.S. 589 (1938). Since Chambers was and is wholly owned by petitioner, the transactions between it and him are to be given close scrutiny. William C. Baird, 25 T.C. 387 (1955). Our ultimate findings of fact are dispositive of this issue. We hold for the petitioner. There is no single formula or test which can give a definitive answer to the question of whether the withdrawals of corporate funds by a sole stockholder constitute dividends or loans. However, over the years the courts have established *200 a number of criteria to assist them in making such a determination. We will discuss below some of the criteria we find applicable here. A. Treatment as loans or receivables on corporate books of account. Whether or not the amounts of the withdrawals are carried on the corporate records as loans or receivables is evidentiary but not conclusive. Regensburg v. Commissioner, 144 F. 2d 41 (C.A. 2, 1944), affirming a Memorandum Opinion of this Court, certiorari denied 323 U.S. 783 (1944); Victor Shaken, 21 T.C. 785 (1954); Moses W. Faitoute, 38 B.T.A. 32 (1938). We have found as a fact that the withdrawals by petitioner from Chambers were treated as loans on the corporate books. We have also found that these withdrawals were included in a category labeled "Due from Officers and Affiliated Companies" on financial statements prepared by a certified public accountant. These statements were provided to the Bank during the years in which Chambers was borrowing large amounts. Respondent points to certain minor errors in the bookkeeping of Chambers and some of its affiliated corporations and the informality with which certain intercorporate *201 transactions were handled. From these observations the respondent argues that Chambers' corporate books are unreliable and that the manner in which petitioner's withdrawals from Chambers are carried is meaningless. Suffice it to say that we have found no facts with respect to these minor errors because we believe they are insignificant and for the most part immaterial. B. The execution of notes evidencing the loan to the lending corporation. In this type of case no citation of authority is necessary to emphasize the evidentiary value of bona fide notes, regular in form, issued by the borrower to the lending corporation. The notes issued by petitioner to Chambers were regular demand, interest-bearing notes. Respondent makes much of the fact that the two notes were issued after many months of borrowing by petitioner from Chambers and were issued in round amounts nearly approximating but not exactly equaling the balances of petitioner's withdrawals. Petitioner has explained that these notes were issued at the end of Chambers' fiscal years when income tax returns and financial statements had to be filed and that he did not issue a note for each of his numerous loans simply to save paperwork. *202 Petitioner admits that the notes were in approximate amounts but contends that he could not be sure of the exact amount of his debt to Chambers until after the corporate financial statements were prepared. In our view these facts do not belie petitioner's avowed intent of securing all of his borrowings from Chambers. Rather, they are merely indicative of the type of informality that frequently exists between a corporation and its sole shareholder. While this is the type of situation which may arouse some suspicion as to transactions between corporations and their sole shareholders, we nevertheless believe that the notes here involved were bona fide. Though one of the checks issued by petitioner to Chambers was designated for interest and another was designated as partially for interest, the petitioner candidly admitted that Chambers never did accrue interest on either of the two notes that he issued. But since we are dealing with petitioner's wholly controlled corporation, the fact that interest was never charged is understandable and not necessarily determinative. See Victor Shaken, supra, and Irving T. Bush, 45 B.T.A. 609 (1941), remanded without consideration *203 of this point 133 F. 2d 1005 (1943). C. Availability of sufficient surplus to cover the withdrawals. Another factor used to determine whether shareholder withdrawals constitute dividends or loans is whether the corporation had sufficient earned surplus to cover the withdrawals at the time they were made. See section 316. Respondent contends, and we agree, that Chambers had sufficient earned surplus during the years in question to cover the amounts distributed to petitioner. Petitioner admits this surplus but claims that it was not available in the form of cash during such years. Respondent argues that when petitioner's borrowings from Chambers began, Chambers had a large receivable which, if collected, would have been more than adequate to provide for its cash needs. We have found that much of petitioner's interests was tied up in litigation with the estate of his deceased brother during the years in issue and it is reasonable to assume, as petitioner points out, that the collection of this receivable at that time was impossible. See Estate of Isadore Benjamin, 28 T.C. 101 (1957). D. Whether or not the stockholder intended to make repayment when he made *204 the withdrawal. An examination of prior cases shows that the intent of a taxpayer with respect to withdrawals made by him from his controlled corporation is very important. Here the testimony of the petitioner was frank and we do not doubt that his intent, at the time of each withdrawal, was to repay the amounts he borrowed from Chambers. Also of significance is the evidence of some repayments. We have found that repayments were made during and after the years before us. It is true that most of the money was repaid subsequent to the years in controversy. Respondent resisted at trial and on brief our consideration of any repayments subsequent to the years 1959 and 1960. In order to present as complete a picture as possible, we have considered those amounts which we deem repayments subsequent to petitioner's taxable years 1959 and 1960, although we have not given great weight to such evidence. See Irving T. Bush, supra. We have also considered the financial ability of the borrower to repay the withdrawals. $ Al Goodman, Inc., 23 T.C. 288 (1954). Our findings of fact make it clear that the petitioner is a wealthy man who was able at any time to repay his *205 borrowings from Chambers and did in fact do so. Finally, we have not ignored the petitioner's personal guarantees and collateralization of Chambers' loans from the Bank. It is quite obvious from the financial statements introduced into evidence that Chambers could not possibly have produced sufficient profits to cover its borrowings from the Bank, and equally obvious that petitioner understood this. Although we agree with respondent that petitioner's liability with respect to these loans was only secondary, it is apparent that petitioner knew he would at some point have to repay these loans with his own personal funds. He eventually did just that. The source of the funds loaned to petitioner by Chambers was the borrowings by Chambers from the Bank. The fact that petitioner saw fit to pass this money through his controlled corporation is of no moment since he intended to repay the loans. The manner in which he handled this was his business decision. Even if we agreed with respondent that this was perhaps not the most economical way for petitioner to acquire the funds he desired, it still has no bearing on the characterization of the withdrawals. The taxpayers in Estate of Isadore Benjamin, supra, *206 also were sufficiently affluent to have provided the funds that one of their corporations needed but they chose to borrow from another of their corporations. We did not find their business decision determinative in that case; nor do we find it determinative here. Moreover, we note that in many respects the facts in this case are similar to those in Benjamin. Hence we have relied upon it. Accordingly, we conclude on this record that the petitioner's withdrawals from Chambers were loans payable to that corporation and not taxable dividends. 2. Losses from operation of proprietorships. On this issue the petitioner contends that his two sole proprietorships, Door Operator and Garage Boy, were and are trades or businesses conducted in good faith for profit. Respondent maintains that they are merely the "pet projects" of a man of "substantial wealth" and that the losses incurred by him with respect to the years 1959 and 1960 should be disallowed. An individual's deductible losses are limited by section 165(c). There are three categories of losses which may be deducted by an individual, but, for our purposes, we are only concerned with "(1) losses incurred in a trade or business." *207 The issue is essentially factual. Theodore Sabelis, 37 T.C. 1058 (1962). Our ultimate finding is dispositive of the issue. We hold for the petitioner. Petitioner has incurred substantial losses over a number of years in connection with his two sole proprietorships. In each of these years he has deducted the losses on joint Federal income tax returns which he filed with his wife. For the taxable years 1959 and 1960 the respondent determined that such losses did not fall within the limitations prescribed by section 165 and disallowed them. Respondent argues that these two companies were not operated for the purpose of making a profit during the taxable years in question. Petitioner disputes this argument and claims that he has in good faith attempted to make profits, that he has conducted his operations in a business-like manner, and that the absence of actual profit does not prelude deductibility under these circumstances. The parties have cited many cases, each having some factual similarity to this case, but none is so precisely similar that we find it controlling. The parties have successfully met each other's arguments, point and counterpoint. While certainly *208 not free from doubt, our best judgment, based on the totality of the facts and circumstances in this record, is that the petitioner has met his burden of profit and should be sustained. The petitioner was a good witness - candid and sincere. The existence of a genuine profit motive is, of course, extremely important in determining whether or not a particular course of activity constitutes a trade or business. Lamont v. Commissioner, 339 F. 2d 377 (C.A. 2, 1965), affirming a Memorandum Opinion of this Court. Consequently, whether petitioner's activities were carried on for business or for pleasure depends, to a considerable degree, on his intent. Edwin S. George, 22 B.T.A. 189 (1931). We think the petitioner had a "profit motive" and that his activities constituted a business. Henry P. White, 23 T.C. 90 (1954), affd. 227 F. 2d 779 (C.A. 6, 1955). Although a business need not realize immediate profit, it must be entered into and carried on in good faith for the purpose of making a profit. Lamont v. Commissioner, supra., Doggett v. Burnet, 65 F. 2d 191 (C.A.D.C., 1933). Substantial losses, standing alone, *209 do not prevent an operation from being a business within the meaning of the statute. Cecil v. Commissioner, 100 F. 2d 896 (C.A. 4, 1939); Deering v. Blair, 23 F. 2d 975 (C.A.D.C., 1928), affirming 5 B.T.A. 1055 (1927). Thus, we are not required to find that petitioner's belief that he could make a profit from his activities was a reasonable belief. Neither are we required to find that petitioner was a good or even average businessman. [4]
Respondent stresses that petitioner is a wealthy man who can afford to spend large sums on his "pet projects." In replying to a similar argument in George D. Widener, 8 B.T.A. 651 (1927), affd. 33 F. 2d 833 (C.A. 3, 1929), we said (p. 658): The fact that the petitioners were wealthy enough to afford a hazardous occupation in which they found pleasure despite discouraging losses does not establish the essential nature of the occupation. If they were utterly indifferent to whether there was loss or gain or if it were shown that the stables were an incident to the social or domestic aspects of their daily lives, the *210 result might be against them, as in Thacher v. Lowe, 288 Fed. 994; 2 Amer. Fed. Tax. Rep. 1931. Instead, it appears that they devoted themselves seriously and assiduously to the economic promotion of their stables always in the hope that profit would result. The petitioner in the instant case was not "utterly indifferent" to loss or gain, nor were his activities merely incidental to the "social or domestic aspects" of his life. Instead he devoted himself, seriously and assiduously, to the economic development of his businesses. Respondent also stresses that petitioner apparently had one indication of real interest with respect to the mass production of his product which he did not pursue. Nowhere in the record do we find an explanation of exactly why no further negotiations took place. However, we do know that the corporation involved was acquired by another corporation which may or may not have had any interest in petitioner's product. We also have petitioner's testimony that his numerous patents were quickly becoming valueless because of the rapid technological advances in the door operator business. Without attempting to reiterate the facts, it is our view that *211 the petitioner's two sole proprietorships were viable businesses conducted for profit. Therefore, we conclude that the petitioner should be allowed to deduct the losses he claimed with respect to these two businesses for the years 1959 and 1960. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954 and the regulations thereunder, unless otherwise indicated.↩
2. It is stipulated that Court Tower Corporation and Court Chambers Corporation are New York corporations. We assume this is also true of the other corporations mentioned.↩
3. Petitioner's income tax return for 1959 does not show any salary received from this corporation.↩
*. Actually these amounts were shown as $6.000 in salary for each of the years 1958, 1959, and 1960 but were all reported as gross income on petitioner's income tax return for 1959.↩
1. This account was actually entitled "DUE FROM MANAGING AGENT" in the financial statement for 1959, and, as noted above, represented amounts due from Management.↩
4. Benjamin E. Adams, T.C. Memo. 1966-242↩ (1966).